Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C., 2003 NCBC 4

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 00-CVS-10358 |

| | |
|---|---|
| SUNBELT RENTALS, INC., a North Carolina corporation,<br><br>            Plaintiff,<br><br>        v.<br><br>HEAD & ENGQUIST EQUIPMENT, L.L.C., d/b/a HI-LIFT, ROBERT HEPLER, DOUGLAS KLINE, MICHAEL QUINN, GREGG L. CHRISTENSEN, PATRICK C. MULDOON, MICHELE U. DOUGHERTY and BRIAN W. PEARSALL,<br><br>            Defendants. | **ORDER AND OPINION** |

{1}     This case highlights a basic duality in our economic system and the business laws which govern that system. Our system is dependent on both competition and ethics. The preservation and promotion of fair competition is one of the primary goals of our business laws. Competition fuels the engines of our economic system. Without it, productivity gains, innovation, efficiency and economy would be severely diminished; employees would have fewer opportunities for betterment; investors would receive smaller returns on their capital; and consumers would pay more for their purchases. Competition, like any fuel not properly contained and utilized, can become destructive.  To insure that competition is beneficial instead of destructive, our business laws impose certain constraints on competition. One of the key mechanisms for imposing those constraints is state unfair competition laws. In this case, the Court is called upon to determine whether certain conduct of the defendants is outside the bounds of fair, ethical competition, and thus violates North Carolina's Unfair and Deceptive Trade Practices Act ("U.D.T.P.A."), N.C.G.S. § 75-1.1.   The Court concludes that in certain instances the competitive actions of the defendants have exceeded the bounds of fair and ethical competition and thus violated that statute.  Plaintiffs have been damaged in the amount of five million dollars, which amount is trebled pursuant to the statute.

{2}     Drawing that boundary and determining appropriate damages for the out of bounds activity has been difficult in this case. The primary difficulties arise from (1) the failure of the plaintiff corporation to take even the most rudimentary steps to protect itself from the very competition about which it now complains, (2) the highly competitive nature of the aerial work platform leasing industry, (3) the key role service and people play in an industry characterized by a uniformity of physical product, (4) the failure of the defendants to testify fully and truthfully, and (5) the overlapping impact of both fair and unfair competition on the damages issues.

{3}     The Court has previously granted summary judgment in favor of all defendants on the plaintiff's claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty. *See Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.*, 2002 NCBC 4 (No. 00 CVS 10358, Mecklenburg County Super. Ct. July 10, 2002) (Tennille, J.)  Additionally, at the close of plaintiff's evidence the Court granted Defendants Patrick Muldoon and Michele Dougherty's motion to dismiss plaintiff's claims against them pursuant to Rule 41 (b).

> *Parker, Poe, Adams & Bernstein, L.L.P., by Edward B. Davis, Deborah L. Edney, William L. Rikard, Jr., and Eric D. Welsh, for plaintiff.*

> *Helms Mulliss & Wicker, P.L.L.C., by Marna M. Albanese, Irving M. Brenner, and Paul M. Navarro, for defendants.*

## I.

### FINDINGS OF FACT

{4}     The following Findings of Fact are entered after 10 days of trial without a jury, hearing 28 live witnesses, reviewing deposition designations for 47 other witnesses covering thousands of pages, and reviewing written discovery responses and over 600 exhibits.

### Parties

{5}     Plaintiff Sunbelt is a North Carolina corporation that rents construction and industrial equipment.  It does business throughout the United States, including Mecklenburg County, North Carolina, where it has a place of business.  On April 20, 2000, Sunbelt announced the purchase of BET Plant Services, Inc. ("Plant Services"), including its division BPS Equipment Rental and Sales ("BPS").  The purchase was consummated on June 1, 2000.  BPS had been in the business of renting, selling and installing construction and industrial aerial work platform equipment and scaffolding since 1939.  Prior to its acquisition by Sunbelt, BPS was headquartered in Jacksonville, Florida, and operated 24 branches located throughout the southeast and south central United States.

{6}     Defendant Head & Engquist Equipment, L.L.C. ("H&E") is a Louisiana corporation doing business in various states throughout the United States, including North Carolina, where one of its divisions, Hi-Lift ("Hi-Lift"), has a branch.  Hi-Lift competes with Sunbelt in the AWP leasing business.

{7}     Defendant Robert Hepler ("Hepler") is a citizen and resident of Florida and served as president of BPS and as a director and officer of Plant Services from 1992 until his employment ended on December 14, 1999.  After leaving his position at BPS, Hepler was employed as president of H&E's Hi-Lift division.  Hepler performs essentially the same duties and responsibilities as president of the Hi-Lift division as he did as president of BPS.

{8}     Defendant Douglas Kline ("Kline") is a citizen and resident of Florida, and from 1992 until the end of his employment on December 14, 1999, Kline served as vice president of finance and chief financial officer of BPS.  Kline joined the Hi-Lift division as its executive vice-president and chief financial officer as part of a package agreement he and Hepler made with H&E.  Kline performs essentially the same duties and responsibilities for Hi-Lift as he did as chief financial officer for BPS.

{9}     Defendant Michael Quinn ("Quinn") is a citizen and resident of Georgia.  From 1989 until January 5, 2000, he was a member of the BPS senior management team, acting primarily as product manager for BPS and its predecessor companies.  At one time he was branch manager of the BPS Atlanta branch.  On January 5, 2000, Hi-Lift employed Quinn as its product manager and as vice president for its Eastern region.  Quinn performs essentially the same duties and responsibilities for Hi-Lift as he performed for BPS.

{10}    Defendant Gregg Christensen ("Christensen") is a citizen and resident of Texas.  Christensen was director of operations at BPS's Western division from approximately 1992 until he left that position on January 14, 2000.  He also was branch manager for the BPS Dallas branch until November 1999.  After leaving BPS, Christensen became Hi-Lift's vice president for its Western division.  Christensen performs essentially the same duties and responsibilities for Hi-Lift as he performed for BPS.

{11}    Defendant Brian W. Pearsall ("Pearsall") is a citizen and resident of Mecklenburg County, North Carolina.  He was the branch manager for BPS in Charlotte, North Carolina until June 2000 and assumed the same position with Hi-Lift when he left BPS.  He is Rob Hepler's brother-in-law.

{12}    Rentokil Initial plc ("Rentokil") is a British company which obtained ownership of Plant Services in connection with a hostile takeover in approximately 1997.  James Wilde ("Wilde") was the manager of Rentokil responsible for oversight of BPS after the Plant Services acquisition.  Hepler and Kline reported to Wilde when Rentokil owned Plant Services and they were employed by BPS.  Rentokil is not a party to this litigation.

### The Equipment Rental Industry

{13}    Before providing an overview of this case, it is helpful to outline the challenges and general practices in the equipment rental industry. This action is concerned principally with equipment rentals of aerial work platforms ("AWP").  AWP equipment consists of boom lifts, scissor lifts, push-around lifts (smaller non-motorized lifts) and reach forklifts. Boom and scissor lifts come in a wide range of models, sizes and functions; they are substantial pieces of equipment that cost thousands of dollars each and encompass a broad variety of devices designed to lift workmen off the ground to do work on jobs that otherwise would be very difficult to reach.  Sometimes included within this class of equipment are "swing stages" and "mast climbers," equipment used to climb alongside buildings and other structures. Hi-Lift purports to operate exclusively in the AWP business.

{14}    The business is highly specialized.  If not delivered, handled or operated properly, AWP equipment can cause substantial injury and even death.  Thus, the nature of the industry is such that its workmen and sales people must be highly trained in the mechanics, applications and operations of the equipment.

{15}    The larger equipment rental companies typically purchase or lease equipment from a limited number of manufacturers.  As of the fall of 1999, the two primary manufacturers of AWP equipment in the United States were JLG Industries (McConnellsburg, Pennsylvania) and Genie Industries (Redmond, Washington). JLG and Genie (and other secondary manufacturers) sell boom lifts, scissor lifts and other AWP equipment in certain standard sizes with various options such as two-wheel drive or four-wheel drive.  Thus, the

competitors in this industry offer, for all practical purposes, the same or very similar equipment to potential customers. As a result, prices tend to be set by the marketplace, and service and equipment availability have become significant factors affecting the success of the businesses in the area.

{16}     AWP managers and salespeople know, from experience or simply by asking their customers, what type of equipment is needed by the different types of contractors for particular jobs. For example, electrical contractors will often use smaller scissor lifts or push-around lifts that can fit through interior doorways, while glass manufacturers working on the outside of buildings need taller boom lifts which can range up to 120 feet in height. Knowledge of the company's customer base contributes to higher utilization of equipment and better selection of the "fleet mix" for a particular market. Such information allows a business to invest in certain machines that yield better rates and profits. A new market entrant has a significant advantage if it has access to that information. With such information, a new entrant can maximize its initial fleet investment with little risk, perhaps saving millions of dollars, and can accurately project an operating budget.

{17}     The potential customers for AWP equipment are general construction contractors, subcontractors (such as electrical, glass and painting companies) and other industrial or commercial businesses that need equipment to work "in the air." These customers are typically identified through numerous public sources—including the yellow pages, business directories and publications (such as Dodge Reports and PEC Reports that list various pending construction sites and related contractors)—and through on-jobsite trailers and direct contacts with contractors. It may be more difficult to determine which industrial customers are in the rental market, although the types of users—airlines, for example—are easy to determine.

{18}     These public directories, reports and other sources not only provide the name of potential customers but also the customer's address, phone number and the name of the person to contact. The Dodge Reports and PEC Reports go further, providing detailed information about construction projects (Dodge) and industrial plants (PEC).

{19}     Long-term rental contracts are rare. Companies typically rent for periods ranging from a day to a month, with weekly rentals being the most common. Even with longer term rentals, the customer is given the opportunity to return the equipment prior to the end of the rental period, paying only for the time rented.

{20}     Rental companies primarily use outside sales representatives to sell and rent AWP equipment. These salesmen typically visit job sites or company offices to attempt to rent equipment. Customer rental decisions are made on varying factors, including price, the relationship between the customer and the sales person, availability of equipment on the customer's schedule, customer service, perceived dependability of the equipment and other considerations particular to the customer. Many customers do business with more than one company to maintain the flexibility and price competitiveness offered by having multiple sources of equipment.

{21}     The personal relationship between the outside salesman and the customer is particularly important for success in this industry. Many salesmen have been calling on the same customers for many years and naturally develop close personal and/or professional relationships that increase the likelihood that the

customer will rent from the salesman's company, other factors being equal. The hiring of salesmen from competitors to take advantage of these customer relationships is not unusual in the industry. It would be unusual, however, for an entire sales force to leave an office at the same time and go to the same competitor and unusual for the majority of salespeople in a number of offices to leave and go to work for the same competitor at the same time.

{22} Nothing in the history of the industry is indicative of mass departures of personnel from one branch to a competitor's branch. The departure of a number of core-positional people at various levels of the branch organization, at approximately the same time, to a competitor, has a major detrimental impact on a branch and can adversely affect the performance of the branch. Personnel changes usually occur as one- or two-person departures at a time.

{23} In terms of price, historical prices have limited value. Prices are quoted and then negotiated between the outside sales representative and the customer or over the telephone with inside sales coordinators. While salesmen would like for prices to remain "confidential," they understand and expect that prices will become known in the market. Customers do not consider quoted prices to be confidential and often reveal price sheets and quoted prices of competitors to obtain more favorable terms. AWP rental companies occasionally quote good customers a fixed price for a job or period of time; these arrangements would constitute confidential information. "Sealed bids" or other formal bidding processes are rarely used. Recent consolidation in the industry has made pricing extremely competitive and has created several large competitors.

{24} Well-run companies in the equipment rental business study their markets and customers and gather various financial, sales and marketing information. This information includes average rental rates, construction information, fleet mix records, revenue per employee, utilization rates and other measures of operations. This information is shared with employees to improve their performance. It is not generally shared with competitors. Most of the information is based on a company's experience and is the type of information that employees would have some general knowledge about and retain. Such information takes some time to accumulate.

{25} Efforts to protect that information exists in the AWP rental industry include obtaining covenants not to compete, placing a general confidentiality policy statement in an employee handbook and limiting access to the information.

{26} The industry has grown considerably over the last five to seven years through "greenfield" startups— startup branches in a market where there has been no prior presence— and, more significantly, through consolidation. As part of the industry consolidation, larger companies have expanded by purchasing smaller companies rather than through greenfield operations. In these acquisitions, the tangible and intangible assets of a branch or multiple branches are acquired, including, importantly, the entire human resource components and goodwill of the company. Consolidation has caused competition to increase and margins to fall. In the year 2000, acquiring companies were paying multiples of five to seven times EBITDA for the acquired company or branch.

{27}    The industry has historically been in short supply of trained, qualified branch managers, sales persons, mechanics, inside sales coordinators, drivers and other related positions. Businesses that are able to retain those personnel develop a considerable competitive advantage based on the investment those businesses make in the employees' training, experience and customer relationships.

{28}    In a typical mature AWP business, the human resource component includes a branch manager, outside sales representatives, an inside sales coordinator, credit manager, service manager, branch administrator, mechanics (both inside as well as field mechanics) and drivers.  In a typical greenfield situation, hiring all these personnel and achieving a satisfactory level of competent employees takes months.  The employment of a number of experienced trained people for these positions within a short time frame (30 days or less) is atypical for this industry.  In fact, such employment is inconsistent with normal marketplace employment activity.

{29}    In the industry, the most important business component is the branch office.  Consequently, the branch manager position is one of critically important leadership in that this person is responsible for the total operation of each branch.  He or she is also responsible for the development of confidential information about branch operations, its equipment fleet, its customers and employees and other related branch activities.  Significantly, a branch manager must be sufficiently familiar with the branch's customers to be able to deal with customers upon the departure of a sales person and thus ensure continuity in the relationship between the branch and its customers.

{30}    A branch manager has "very unique, very useful knowledge" of all personnel in the branch: competency levels, work ethics, salary/compensation, customer relationships and other personnel related matters.  He or she is intimately involved in supervising a branch's sales force and in effect operates as a sales manager for each sales force.  He or she must also supervise the service side of the branch, including the service manager, the mechanics and drivers.

{31}    The individuals working for the branch manager—sales personnel, mechanics and other service related personnel—must act interdependently to deliver the equipment and service to customers.  Sales personnel are the conduit through which businesses (branches) have relationships with customers. As stated by a customer called by defendant as a witness, sales personnel are the "face person" for the relationship with the customer.  The service manager, mechanics and drivers all support the relationship with the customer by initial delivery of the equipment, training a customer in the operation of the equipment, regular maintenance of the equipment and prompt field repair of the equipment in the event of breakdowns.  Service personnel have frequent and close contact with customers. The AWP business requires a high service component and the presence of a strong team effort.

{32}    All AWP personnel undergo regular training.  Sales personnel, for example, have to know the uses of the equipment and the most advantageous applications of it.  Inside sales coordinators need to know equipment applications to provide appropriate advice to customers. The mechanics and service personnel have to be able to maintain and deliver the equipment to the satisfaction of customers, including OSHA-required familiarization.

**Overview**

{33}    Before discussing the detailed Findings of Fact, a general overview of the core facts is helpful.

{34}    Defendants Hepler and Kline were employed by BPS. They played significant roles in the creation of a successful business at BPS renting aerial work platforms to construction companies and industrial users both before and during the time it was owned by Rentokil. BPS had rental locations in several key markets in the Southeast, including Atlanta, Charlotte, Tampa-Fort Myers, Orlando, Dallas and Houston. When Rentokil decided to sell BPS in 1999, it did not consult with or inform Hepler and Kline of the decision and did not offer them any inducement to stay with the company through consummation of any sale. Neither had a contract that restricted his employment by a competitor.

{35}    Accordingly, Hepler and Kline devised a business plan that envisioned competing directly with BPS in its key branches in the Southeast. A successful AWP leasing business required two key ingredients: capital and the right people.

{36}    At the heart of the plan was the conversion of the employee base of the targeted BPS branches and key BPS management in addition to Hepler and Kline. With the conversion of those key employees came all the information necessary to ramp up a greenfield operation more rapidly than would normally occur. The branch managers were thoroughly knowledgeable about the business of each branch, including the employee base, competition and pricing in the local market, the fleet mix, the customer base, and every other aspect of the local operation. The service employees were already trained and knew the equipment, customers, job sites and safety requirements. The salesmen knew the customers, the locations of current and upcoming jobs, and the prevailing market prices for the equipment to go on the jobs. The credit managers knew the credit history of the customer base. Each employee brought with him or her the knowledge of the systems, information and records necessary to the smooth functioning of an AWP rental operation. Concomitantly, the departure of each of those employees left BPS with a void, which impacted its ability to compete in the local market in the short term. Significantly, not one of the employees hired by H&E, including Hepler and Kline, had any form of contract containing a restrictive covenant or a covenant not to compete.

{37}    Capital was required to purchase or lease the significant amounts of large and expensive equipment that constituted the lease products of the business and to fund other startup costs. H&E provided the capital and financial backing to bring the business plan to fruition. During the six-month period between their departure from BPS and the closing of its sale to Sunbelt, Hepler and Kline together with the other defendants successfully enticed significant numbers of the key management and skilled employees of the targeted branches to leave and join the new venture with H&E. That six-month period was one of extreme vulnerability for BPS, but a vulnerability of BPS's own creation.

{38}    Three factors, discussed more fully below, have entered into the determination that defendants' actions —which when taken alone or in isolation might not have been outside the bounds of fair competition—when viewed collectively crossed over the boundary.  First is the use of then BPS managers to accomplish the raid on BPS employees. Second is the magnitude of the raid.  Third is the coordinated timing of the departures.

## BPS and Its Operations

{39}    Five companies acquired by Plant Services were consolidated into BPS in approximately 1993 to 1994. These included Hepler Hi-Lift, which Defendant Hepler founded, and four other companies: Able Equipment Company, Safe-T-Green, Booms and Scissors, and Florida Contractor Rentals and Sales.

{40}    Defendant Kline was the chief financial officer for Safe-T-Green and in 1994 was moved to BPS headquarters in Jacksonville, Florida to become the chief financial officer for BPS, working directly under Hepler.

{41}    Under Hepler and Kline, BPS had a senior management team which included: Doug Guy, director of Eastern operations; Christensen, director of Western operations; Jeff Stachowiak, director of marketing, sales and safety; John McGraw, director of scaffolding; and Mike Quinn, product manager.

{42}    During Hepler's tenure as president, the senior management team met regularly, at least once per month. At its meetings, the senior management team discussed customers, mechanic availability, sales personnel, equipment utilization, safety, marketing, product mix, average rental rates, planning and other matters. Branches were regularly evaluated branch-by-branch. Senior management regularly shared BPS marketing, customer and internally developed information. This information included head counts, salary information, pricing, organizational structure, financial projections and forecasts, cost information, branch budgets and customer information, including the identity, contacts and requirements of its rental customers, pricing in effect for those customers and fleet utilization information by branch. Senior management knew that this information was confidential.

{43}    Defendants Hepler and Kline managed the day-to-day affairs of BPS, made strategic decisions, developed and implemented budgets and hired and fired employees. Hepler was involved in all levels of the business. He frequently visited branches, discussed up and coming job sites and sales personnel and was actively involved with customers. Kline was involved in all aspects of the business as the result of his financial responsibilities. In particular, he was extensively involved with branch managers in budgeting. Hepler and Kline were highly compensated. Hepler was paid a salary of $260,000 in 1999, and Kline was paid a salary of $160,000 to manage 24 branch operations throughout the Southeast and South Central United States. They had access to and knowledge of BPS's confidential business information.

{44}    Defendant Christensen, as Western regional manager for BPS, was closely involved in personnel issues, budgets, fleet mix and management of the branches for which he was responsible. He was directly involved in the BPS Texas branches and, in fact, managed the Dallas branch for several years. He had access to all of BPS's confidential business information related to his geographic area of responsibility.

{45}    Defendant Quinn was involved in a variety of senior management issues, including budgets and, most importantly for him, fleet management. He was intimately involved with fleet utilization, equipment ordering, scheduling delivery dates, and equipment movement. Transferring equipment between branches facilitated utilization. He had access to and knowledge of BPS's confidential business information.

{46}    BPS placed special emphasis on its branches and branch managers. Among its most experienced branch managers at the end of 1999 were: Mark Alexander ("Alexander") (9 years, 7 months) (Atlanta); Duke Drennan ("Drennan") (18 years, 7 months) (Orlando); Beare Jones ("B. Jones") (20 years, 5 months) (Tampa/Fort Myers); Abe Farrington ("Farrington") (5 years, 3 months) (Dallas); David Hobbs ("Hobbs") (4 years 3 months) (Charleston, South Carolina); and Defendant Pearsall (13 years) (Charlotte). These branch managers dominated their branches, recruited, hired, reviewed and fired employees, set salaries, trained and certified employees, set prices and rates for customers in their markets, developed confidential information

for their respective markets, prepared budgets for their branches and carried out the multiple other business and leadership duties and responsibilities expected of a branch manager. The branch managers were in continuous contact with senior management.

{47}    Branch managers regularly made presentations to their peers about their branch operations with emphasis on the keys to success they had found in operating their branches. For example, Alexander made a presentation to the BPS branch managers in June 1999, in which he emphasized:

(a) the longevity and experience of his sales staff ("60 years of combined experience");

(b)  the branch's interdependence of its personnel and its emphasis on team work; and

(c)  the Atlanta branch's success in retaining customers. ("WE DON'T LOSE CUSTOMERS.")

{48}    In order to protect its information, BPS implemented an employee handbook containing a section on confidential information. In fact, developing the handbook was the direct responsibility of Defendant Kline, who rewrote, in his own handwriting, that section of the handbook dealing not only with confidentiality but also with employee loyalty. Each BPS employee was required to acknowledge receipt of the handbook in writing. Virtually all of the BPS/Sunbelt employees who left to become employed by H&E signed such an acknowledgment. Hepler and Kline have both separately acknowledged the presence of trade secrets in this industry. Additionally, some defendants and many of their H&E employees also admitted that certain information is confidential and is not to be shared with competitors.

{49}   BPS's business information was treated as confidential when discussed by senior management. Efforts were made to protect it at the branches. For example, the war rooms had the information taken down from the walls when outside people came in.  Pricing was kept in special books. Branch managers (e.g. Pearsall) had specific rules about file removal from the branch office. Passwords were required and given to only certain personnel with respect to the BPS computer system. Salesmen's information was limited to customers for which they had responsibility. Only branch managers had access to information on all branch customers. Salary information was kept under lock and key at the branches.

{50}   Based on senior management discussions, the individual defendants were acutely aware that BPS lacked depth in a number of its human resource requirements. BPS senior management had frequently discussed that it did not have sufficient human resource reserves for its sales people. The individual defendants were acutely aware of the intense competitive pressures regarding qualified experienced mechanics and drivers and knew that those positions were in short supply in all of their markets. As a result, Defendants Hepler, Kline, Quinn, Christensen and H&E knew that the branches from which they successfully recruited BPS personnel *en masse* would be seriously harmed by those departures and that those branches would not have sufficient human resources to compete effectively with H&E until the departed employees could be replaced and trained.

{51}    Over the years at BPS, the branch managers developed close personal and professional relationships with many of their long-time employees, who in turn formed close relationships among themselves; there are examples of shared family relationships as well, with fathers, wives, sons or brothers working in the same

branch. These relationships often mirrored those more commonly found in a family-run business.

{52}     Outside sales representatives usually reported directly to the branch manager, as did the inside sales coordinators. The inside sales coordinators were responsible for taking orders over the phone from customers, both those who had been solicited by the outside salesmen and others who called in to shop for prices over the telephone. The inside sales coordinators were also responsible for scheduling deliveries and dispatching drivers to deliver and pick up equipment which had been called "off rent." Larger branches had service managers who reported to the branch manager. The service managers were responsible for supervising the mechanics (both shop mechanics and field mechanics), the parts department, the shop foreman and, to a limited extent, the drivers.

{53}     The branch administrative personnel—i.e., the branch administrator, credit department employees and receptionist—also ultimately reported to the branch manager. Each of the branch employees served an important function at the branch and participated in training appropriate to his or her position. Training for mechanics was handled primarily through on-the-job experience and training classes provided by the manufacturers. The safety concerns surrounding use of the equipment made trained mechanics critical. Salesmen, to the extent they were not already experienced in the industry, were trained through experience and advice from the branch manager and fellow sales representatives. Drivers with no experience were trained through manufacturer classes, training videos and practice at the branch location. The process of training drivers typically took no more than two to three weeks.

{54}     In addition to routine sales efforts, sales duties at the branch level consisted of assigning salesmen to territories, identifying target customers, creating "war rooms" to further identify ongoing and potential jobsite and customer opportunities, and discussing competitive pressures. Sales meetings among the sales representatives and the branch manager were sometimes held to discuss sales efforts throughout the branch.

{55}     Rental contract records were maintained both in the company's computer database and in "hard copy" files maintained at the branches. The rental contracts typically included the name, address and telephone number of the customer; the name and contact information of the customer who had rented the equipment; the price at which the equipment was being rented; the expected term of the rental; and often directions to the job site where the equipment was to be used. Sometimes hand tickets were prepared which included varying amounts of the information found on the typical printed rental contract. The rental contracts were delivered to the job site with the equipment, and a contract copy was left with the customer.

{56}     As of the end of 1999, BPS included the following among its southeastern and Texas branch locations: Atlanta, Tampa, Fort Myers, Orlando, Miami, Jacksonville, Charlotte, Raleigh, Charleston, Richmond, Dallas, Houston and Austin. BPS had additional branches in Arizona, California and Nevada. By virtue of his presidency at BPS and prior experience with his own business, Hepler had extensive knowledge of the AWP market in each of these cities.

{57}     Hepler also had long-standing personal relationships with many of the BPS branch managers. As of January 2000, the branch manager of the Atlanta branch was Mark Alexander. Hepler had known Alexander, either as a competitor or as one of the BPS branch managers, since the early 1990's. They were

personal friends in addition to their professional relationship. Alexander was also close to Quinn.

{58} The branch manager of the Tampa and Fort Myers, Florida branches as of January 2000 was Beare Jones ("Jones"). Hepler and Jones were extremely close friends. Jones has worked for either Hepler or Hepler's father in the equipment rental business for nearly forty years. At the age of seven or eight, Hepler, now 46 years old, began working in his father's business with Jones.

{59} The long-time BPS branch manager for Charlotte was Defendant Brian Pearsall. Pearsall is, as noted above, Hepler's brother-in-law. Hepler and Pearsall had worked together for over ten years as of January 2000.

{60} The BPS branch manager for Charleston, South Carolina in January 2000 was David Hobbs ("Hobbs"). Hobbs started as a BPS employee in the BPS Jacksonville office and developed a close relationship with Hepler as he was promoted through various positions at the Jacksonville branch and later to the position of branch manager in Charleston.

{61} The branch manager for the BPS Orlando branch at the beginning of 2000 was Duke Drennan ("Drennan"). While not as close personally to Drennan as he was to the other branch managers discussed above, Hepler had known and worked with Drennan for over ten years as of January 2000.

{62} Hepler also had close personal relationships with BPS employees below the branch manager level and frequently played golf with the salesmen.

{63} In summary, Hepler and Kline were in an ideal position to recruit BPS employees to go to work with H&E. No BPS employee was restrained by a restrictive covenant.

{64} The announcement that Plant Services was for sale caused uncertainty and insecurity among the BPS employees. When it had previously attempted to sell Plant Services, Rentokil had purchased some protection against this vulnerability by contracting with Hepler and Kline to stay on through a transition with a new owner. In 1999 Rentokil elected not to purchase that same protection, leaving Hepler and Kline to go to work for a competitor at the time BPS would be most vulnerable. Rentokil was either unaware or unconcerned about the close relationship between Hepler and Kline and the branch managers.

{65} Insecurity among the BPS employees was understandable. The possibility existed that BPS would be purchased by a large competitor who would close branches and consolidate management practices. Four of the key managers who had guided the company to success had left abruptly and without explanation.

{66} Not until the problems posed by Hi-Lift were apparent did Sunbelt/BPS offer "loyalty contracts" to some of the BPS managers. Sunbelt's president, Bruce Dressel ("Dressel"), visited nine BPS branches and discussed with BPS branch managers Sunbelt's desire that they stay with BPS and work for Sunbelt. Drennan assured Dressel he was "on board" with the Sunbelt acquisition. Jones did not commit but gave no indication that he would not be staying. Defendant Pearsall accepted Sunbelt's invitation to attend Vendorfest.

{67} Rentokil elected not to spend any money to protect itself against loss of employees during the period of time BPS was for sale, despite the fact that its two key employees had left to join a company that would compete with BPS. That fact was clearly known to Sunbelt when it elected to purchase BPS. In fact, Dressel chided Wilde for his failure to keep Hepler and Kline on board during the transition.

## H&E and Hi-Lift and Its Operations

{68}    H&E has been in existence since the 1960's and built a reputation in the Gulf region in the crane and dirt movement business. At some point in the 1990's, H&E entered the rental business by acquiring a small fleet of equipment from Grove Manufacturing ("Grove"), another but smaller manufacturer of equipment. H&E was not very successful with its fleet. It apparently had a fleet of approximately 1,000 to 1,200 units spread across at least five locations, including Gonzales, Louisiana; Memphis, Tennessee; and Houston, Dallas and San Antonio, Texas. The fleet in Dallas was only about 250 units, and the fleet in Houston approximately 300 units. Engquist himself described H&E's fleet, which operated out of locations that also had the crane and dirt moving business intermixed, as a problem and "struggling." The Memphis and Gonzales branches, even though in "major markets," were later closed. The Court notes that, during the events of this litigation, H&E provided no evidence that it opened any branch under the Hi-Lift name in any location other than those in which BPS had an existing branch, and that it closed the Memphis and Gonzales AWP operations, two markets in which BPS had no presence.

{69}    While H&E had a minor AWP presence in Dallas, Houston and San Antonio, the evidence that the fleet was struggling suggests that H&E's efforts were not formed or based on any highly developed business information. Hi-Lift had no market presence and no market information of its own about Atlanta, Charlotte, Tampa/Fort Myers or Orlando. The Grove AWP equipment these branches used was not nearly as widely used as the Genie and JLG equipment. Thus, customers were more familiar with and wanted Genie and JLG equipment. Quinn was exceptionally knowledgeable with respect to the purchasing of that equipment.

{70}    In mid-1999, H&E was purchased in part by an investment group, Bruckmann, Rosser and Sherrill ("BRS").[1] At about the same time, ICM (located in Salt Lake City) was also purchased by BRS, thus linking H&E and ICM. In fact, this common owner considered from the outset merging the two companies. The Court further notes that the boards of directors of ICM and H&E met jointly, and Gary Bagley ("Bagley"), C.E.O. and president of ICM, was a member of H&E's board of directors in part of 2000 and part of 2001. Further, Hepler testified that he and Kline spent a day in Jacksonville with Earl Rose, branch manager, conferring about business plans to open locations in the Northwest based on the Hi-Lift plan he and Bagley had been discussing.

{71}    The broader picture for Hi-Lift and its investors is clear. H&E and ICM each had an AWP business that would benefit from the experienced management that Hepler, Kline, Quinn and Christensen could provide. When Hepler and Kline were hired, a plan was in place pursuant to which H&E would open AWP rental operations in Charlotte, Atlanta, Orlando and Tampa Bay-Fort Myers, and the former Grove-dominated AWP operations in Dallas and Houston would be converted to Genie and J&G equipment and run similar to the BPS branches in those locations. It is also apparent that there was at a minimum the likely prospect of some combination of the H&E and ICM AWP business so as to produce a company with coast-to-coast branches capable of competing with the largest players in the market. That likelihood has come to fruition with the merger of H&E and ICM and the creation of an AWP division encompassing the branches of both ICM and H&E.

{72}    If carried out in a fair manner, it was a well-conceived and perfectly legitimate business plan. H&E had every right to compete with BPS Sunbelt in a fair manner, and, given the experience of its management and the capital resources of its financial backers, it would have been a formidable competitor under any

circumstances. The Court does not find that the existence of such a plan was an unfair trade practice. The plan was a perfectly proper competitive strategy. The defendants were free to compete fairly with BPS in any market. BPS and its owners had the ability to provide some protection against that competition and elected not to pay the price to do so.

{73} The implementation of the consolidation and expansion plan is where the activities occurred which give rise to liability in this action. In their testimony, defendants contended that no plan existed to raid BPS at specific locations and that the defections which occurred were unsolicited and unplanned. The Court, as finder of fact, does not find that testimony credible.

{74} Hi-Lift hired Hepler, Kline, Quinn and Christensen at salaries that were commensurate with the development of a large organization such as has been developed by Hi-Lift. Quinn provided the necessary purchasing expertise for such a large operation and expansion, and Christensen provided the West Coast management necessary since Hepler and Kline wanted to stay on the East Coast.

{75} Hepler and the branch managers testified that there were no prior discussions or solicitation of personnel. The Court finds that testimony is not credible and that those activities did take place. What actually happened is a clear indication that these activities occurred. In the cases of the Charlotte, Atlanta, Orlando, and Tampa-Fort Myers branches, a pattern of lining up salesmen and other key employees to leave at the same time is apparent.

{76} In each instance, the branch manager was offered compensation, including a signing bonus that was in excess of his or her BPS compensation or covered the bonus he or she would have gotten from BPS/Sunbelt for signing a loyalty contract. The branch manager then recruited the key or skilled employees (sometimes referred to as the "A Team") needed to open quickly. These key employees included the most experienced outside sales people, the inside sales person, the service manager, experienced mechanics and drivers, and the administrative or credit manager. While the detailed information about the branches was useful, it was not necessary because the recruited employees brought all their knowledge and skills with them. Had H&E opened a greenfield office in one of the locations, many employees might have switched over in time. It is also possible that BPS could have made them counteroffers from which they would have benefited and for which they would have stayed. That did not happen because of the wrongful conversion of employees by Hepler and the branch managers.

{77} The fact that there was no effort to fill these new positions outside BPS is a strong indicator that the branch managers knew who was lined up to leave. The ability of Hi-Lift to begin operations at a level and at a speed far in excess of those normally associated with a greenfield is indicative of the value these key, skilled, core employees brought with them.

{78} The fact that each of the new H&E locations at former BPS branches were opened before Sunbelt consummated its purchase of Plant Services is a clear indication that H&E rushed to open these branches while BPS was in the transition period and most vulnerable to a raid on its employees.[2] The timetable contributed to the need to use the branch managers as recruiters prior to the establishment of a Hi-Lift branch.

{79} Most of the individual acts standing alone would not have risen to the level of unfair competition or an unfair trade practice. For example, if BPS salesman Ken Farris had voluntarily left BPS and gone to work for United Rentals in Atlanta, he could have called on his old customers, used his past knowledge and experience with respect to the type of equipment they used and even promised to meet or beat BPS prices, knowing full well the BPS price structure, including specific prices for particular customers on a known job

site.

{80}   Hepler and Kline were free to go to work for a competitor. In doing so, they were not restricted from directing the sales people of the new employer to call on customers whom Hepler and Kline knew to be former BPS customers or from using the knowledge and skills they gained while working in the industry.

{81}   The critical issues arise from both the expansive nature and the cumulative effects of the H&E actions. In the context of an industry in which service may be the significant business determinant and trained employees are not plentiful, the consequences of a secret wholesale raid on a competitor's employees are clearly discernable in advance. The competitor's revenue is likely to be impacted by the inability to service customers in a normal businesslike manner.

{82}   The Court finds that defendants used the BPS branch managers, while they were still employed by BPS, to recruit employees to leave BPS branches in a concerted and orchestrated manner, which had the dual effect of temporarily immobilizing the BPS branch and permitting Hi-Lift to fill the void so created to appropriate BPS's business to Hi-Lift, at least temporarily.

### Hepler/Kline Decision to Leave BPS

{83}   The past history of the first attempted sale of Plant Services is instructive. Plant Services had been put on the market for sale in 1998. During the process of that potential sale, Hepler and Kline were intimately involved in the preparations for sale. Pursuant to an agreement with Rentokil, Plant Services' parent, Hepler stood to make as much as four times his salary if the sale was completed—Kline, a lesser amount. As a result, Hepler and Kline did not consider departing BPS in 1998.

{84}   As part of the process, Hepler and Kline made confidential presentations for Plant Services about BPS. One of those presentations was made to Bagley, a representative of ICM, a business in the Northwest that had some AWP operations.

{85}   No sale was made in 1998, although Ripplewood/ICM was discussing offering $800 million for Plant Services.

{86}   Rentokil decided in 1999 to put Plant Services back on the market; however, they handled the matter very poorly. In August 1999, Hepler and Kline learned of the proposed sale before they were informed of it by Rentokil management. Hepler and Kline reacted negatively to the proposed sale of BPS. In fact, Hepler described himself as being quite angry about the sale. Their reaction was understandable, given the 1998 arrangement and the contribution they made to BPS and the way they found out about the sale.

{87}   After learning of the proposed sale of Plant Services, Hepler and Kline communicated with each other about their dissatisfaction and their intention to leave BPS. However, they did not communicate their displeasure and desire to leave to their superiors at Rentokil.

{88}   Hepler worked out a potential consultancy with Genie Industries, one of the principal suppliers of equipment to BPS. Kline had no such prospects, and only had an interview lined up which did not get past a video interview. Hepler apparently made inquiry of Genie during this time as to whether it would support a new venture put together by Hepler and Kline.

{89}   According to Hepler, he received a call from a potential investor named Bob Williams ("Williams") in August 1999, in response to which he and Kline developed a very specific business plan for Aerial Equipment Specialists (the "AES Plan"). This business plan:

   (a)   Stated that the management of BPS was committed to the plan:

"The majority of the management team is committed to AES . . . . The five senior managers (CEO, CFO, Director of Operations, Product Director and Director of Marketing) have worked together as a team for over six years . . .."

(b)      Stated that specific fleet mixes for the specifically identified markets:

"We have developed a fleet mix for each of the proposed branches, which will coincide with the needs of the local rental market . . . . The equipment mix, as well as the option list, was formulated by experience in each of these markets to maximize utilization."

(c)      Emphasized customer targeting as BPS had done in the past:

"[W]e target . . .those customers for the following reasons:

- [T]hey . . .understand the added value concept of providing exactly what the customer needs.

- [T]hey are more responsible and less abusive to our products.

- These customers tend to be established and will pay for services rendered promptly . . . ."


(d)      Identified seven geographical locations where the company would do business;

(e)      Specified employee compensation and other equipment formulae for the branches;

(f)      Set forth specific operating ratios (e.g. AWP's per delivery driver, sales person and mechanic);

(g)      Made projections and forecasts for each location; and

(h)      Included average monthly rental rates for each of the seven branches cited, which were then used to develop the rental revenue in the financial model.

{90}      The branch locations, employee compensation and other aspects of the AES Plan are strikingly similar to the plan defendants actually implemented at H&E.  The Court concludes that Kline must have used BPS information in formulating the AES plan.  The information in the AES Plan was accessible to Kline from BPS information.   It is not information that anyone could carry in his head.  For instance, the average monthly rental rates set forth for each market and for each product group in the AES Plan are different, and as the AES Plan itself states, "[were] formulated by experience in each of these markets to maximize utilization."  More specifically, there are 20 products listed (12 booms and 8 scissors) and 7 markets; in other words, 140 different individualized average rental rates were quoted in the AES Plan. Thus, inclusion of such information in the AES Plan manifests defendants' intentions, from at least August 1999, to take advantage of information developed by BPS.  Kline admitted that at the time the AES Plan was prepared, he had access to average rental rates for the BPS branches in Atlanta, Charlotte, Orlando, Dallas, Houston and Tampa, and that gross margins were based upon his experience at BPS. However, given the commodity nature of the equipment and the highly competitive market, it was probably not difficult to project margins.

{91}      In testifying at trial about the AES Plan, Hepler gave very contradictory testimony.  On one day, he testified he knew nothing about the information contained under operating ratios, contending that Kline alone had put together that information. The next day, however, Hepler testified that he did know about those ratios and that they were just generic.

{92}     After the development of the AES Plan, Hepler and Kline sent the plan to Williams and made presentations of it to at least two other investors, one involving a trip to South Bend, Indiana. In those presentations, Hepler and Kline did not qualify the specific declarative representations contained in the plan.

{93}     At least as early as October 19, 1999, Defendants Hepler and Kline began consulting with attorneys about their activities. Hepler and Kline gave their attorneys earlier employment agreements for review. On October 25, 1999, they submitted the BPS Employee Handbook and the AES Plan for review. They specifically conferred with their attorneys regarding "potential litigation issues."

{94}     According to Hepler, he and Kline had decided to resign from BPS on the evening of November 10th in Houston. Because this dinner with James Wilde was canceled, however, they did not resign.

{95}     According to Hepler, sometime before November 11, 1999, he received a call from Gary Bagley at ICM inquiring about his status. Bagley was aware that Plant Services was again for sale, but ICM was not approaching Plant Services. As a result of this and follow-up calls, Hepler arranged to meet Bagley in Dallas, Texas on November 11, 1999, after having a budget meeting in Houston with Hepler's BPS superiors on November 10, 1999. Bruckmann and Bagley traveled to this meeting from California and Utah, respectively, to meet Hepler. Conversations between Bagley and Hepler indicate that there would be no need for ICM to bid for Plant Services. By hiring Helper and Kline, ICM would be able to benefit from their implementation of the AES Plan at much less cost than an acquisition of Plant Services.

{96}     Bruce Bruckmann, whose investment group owned H&E, attended the November 11, 1999 meeting between Hepler and Bagley in Dallas. Kline was not present. Defendants characterized the meeting as an "employment interview." Hepler testified at his deposition that, even though he had not discussed the proposition with Kline, he told Bagley and Bruckmann that he was not interested in a position unless Kline was also offered a position. Hepler and Kline had consulted their attorney about the interview in advance of it.

{97}     Immediately after the November 11, 1999 Dallas meeting, Defendants Hepler and Kline both called James Wilde, chairman and president of Plant Services and regional managing director of Rentokil, to resign from BPS. Defendants said nothing about their competitive plans and activities. Wilde would not accept their resignations without meeting with them. Defendants Hepler and Kline, without Wilde's knowledge, proceeded to tell other BPS senior management that they intended to leave.

{98}     Shortly after the November 11, 1999 meeting with Bagley and Bruckmann, Hepler began a series of telephone calls with Bagley. These telephone calls led to a meeting in Dallas on November 23, 1999, attended by Hepler, Kline, Bruckmann, Bagley, Hal Rosser of Bruckmann Rosser, and others. The meeting took place at the Admiral Club at the Dallas Airport. Engquist met Helper and Kline for the first time at this meeting. After approximately two hours of discussion, Hepler and Kline were offered employment at H&E at salaries of $300,000 and $200,000, respectively. These salaries were more in line with salaries for managing a nationwide AWP operation, not just H&E's AWP operation.

{99}     Engquist testified that he hired Hepler and Kline in order to address problems with H&E's fleet, which

consisted of Grove equipment. Thus, Hepler and Kline were offered a $500,000 compensation package, an amount greater than their BPS compensation, to take over an aging fleet that was approximately a tenth the size of the BPS fleet.

{100}   Significantly, Engquist was concerned about the availability of personnel in the business and at this meeting specifically "questioned" whether Hepler and Kline would be able to obtain the "right people" to grow the business.   Hepler responded that he was confident that he could. Hepler and Kline's disproportionate compensation for the H&E fleet, Engquist's statements regarding the "right people," Bruckmann's repeated involvement in meeting with Hepler and the large contingency of personnel in attendance at the November 23 meeting in Dallas, the AES Plan and the subsequent hiring of Quinn and Christensen at salaries in excess of $100,000 each confirm that defendants intended to expand H&E with BPS personnel, and on a scope with the AES plan.   Engquist remained involved in the decision-making process that led to the hiring of Christensen, Quinn, Alexander and Hobbs and signed off on the employment of numerous other BPS employees, including Abe Farrington, Beare Jones, Duke Drennan, Brian Pearsall, Steve Mathews, Ken Moon and Dan Franz.

{101}   Hepler and Kline did not accept the job offers on the spot, contending that they had agreed to meet in person with Wilde before anything happened on their resignations.   Eight days later, on December 1, 1999, when James Wilde was again in the United States in Jacksonville, they officially resigned and at Wilde's request submitted written resignations.  Wilde asked Hepler and Kline to stay on to sell BPS, or stay at least for a longer notice period.  Hepler and Kline, after conferring with Engquist, refused. They gave BPS only two weeks' notice.  A public announcement was made of their resignations on December 1, 1999.

{102}   During the notice period, Hepler and Kline had several discussions with their attorneys.  On December 14, 1999, before flying to Baton Rouge that night to begin their employment at Hi-Lift, they consulted with their attorney about litigation risks, solicitation of BPS employees, and consultations with H&E concerning the same.  Defendant Kline testified in his deposition that on December 15th, after discussion of BPS solicitation of employees came up, Hepler and Kline and Engquist had a conversation with H&E's attorney, Ashley Moore.

{103}   Hepler and Kline both have testified in deposition and Hepler at trial about going to Baton Rouge on December 15th.  On the afternoon of December 15, 1999, Engquist suggested that they fly to Dallas the next day to review the H&E AWP fleet at Martin Equipment. After that suggestion, according to Engquist, Hepler and Kline began conversations with Engquist about the employment of Defendants Quinn and Christensen.

{104}   As described by both Hepler and Kline in deposition, and by Hepler at trial, Hepler and Kline raised the issue of employment of Quinn and Christensen with Engquist because they needed Quinn to "manage the fleet" and Christensen to manage the western operations, particularly the branches in Texas for H&E where Christensen had worked for BPS.  They further testified that on December 15th they discussed compensation in excess of $100,000 each for Christensen and Quinn and that Engquist was agreeable to that compensation.  In their testimony, they suggested that Engquist meet Quinn and Christensen in Dallas the

next day before making any final decision.

{105}   Hepler testified that he had had no contact with Christensen and Quinn about getting together in Dallas until after the December 15th discussion with Engquist.  In this, Kline's deposition testimony and Hepler's trial testimony directly conflict with the testimony of their co-defendant, Quinn.  Quinn testified in his deposition that when he was first contacted by telephone by Hepler to tell him that Hepler was going to work for H&E, Hepler wanted to talk to him about employment at H&E, and would be contacting him again.  Quinn further testified that shortly thereafter he received another call from Hepler setting up a meeting in Dallas "within the next week or so."  Quinn's travel itinerary shows that on December 9th he had already booked a flight from Florida to Dallas arriving in the Dallas airport at 2:30 p.m. December 16th.  This timing supports Quinn's testimony that the Dallas meeting was arranged several days in advance.  Further evidence that Quinn was conspiring with Hepler is found in Quinn's testimony that he accepted employment with H&E without a specific compensation offer even though Quinn expressed doubts about Hi-Lift.

{106}   Defendants did not present Defendant Quinn for testimony at trial.  Nor did they call Defendant Pearsall, Drennan, Jones, Shelly Parnell, or others whose deposition testimony contradicted Hepler, Kline or Engquist.

{107}    Immediately upon Hepler's return from Christmas vacation, he proceeded to recruit additional BPS employees.

{108}   Hepler and Quinn traveled to Atlanta on January 6, 2000 to meet with Alexander; Alexander was the Atlanta branch manager, BPS's largest branch and among its most successful.  Notwithstanding Hepler's testimony that H&E had no definite plan at this time to open in Atlanta, Hepler and Quinn sought assurances that Alexander would be "available when it came time to leave."   Hepler's testimony about this meeting is not credible.

{109}   The very next day, Hepler and Quinn had breakfast with Gary Maner, BPS's national service manager.  At that time, they offered him employment to head up the rebuild facility for H&E, the same initiative that BPS was supposed to have achieved as a strategic initiative in 1999.  This is another example of Hepler and Quinn's use of knowledge of BPS's business plan for the immediate benefit of Hi-Lift.

{110}   On January 9, 2000, Hepler, Kline and Quinn flew to Seattle, Washington to meet with Genie Industries, the major supplier of AWP equipment and according to the AES Plan the "preferred supplier."   According to Hepler and Engquist, who later joined the other defendants, the purpose of this meeting was to become acquainted with Genie, with whom H&E had nothing but a casual business relationship at that time.  According to Hepler, H&E was able to convince Genie that it was a sufficient size player to obtain very favorable pricing and terms on equipment.  Even though it was only three days after his Atlanta recruiting efforts, Hepler testified that an Atlanta branch was not discussed as a real possibility at that point with Genie.  Engquist, however, testified that they had committed to Genie that Hi-Lift would open a branch in Atlanta.  For this reason and other reasons, the Court again finds Hepler's testimony not to be credible.

{111}    Thereafter, H&E set about communicating with JLG, another major AWP equipment manufacturer,

about orders to be placed with JLG.  Hepler testified that with respect to both entities, they were able to achieve contracts that would allow them to move equipment around freely, cancel and substitute orders and do other things that minimized the financial risks of purchase orders to either manufacturer.  There were serious discrepancies between Hepler's testimony and the contracts themselves.

{112}   Based on the quantity of equipment ordered by Quinn on behalf of H&E, substantial thought had to go into the ordering of the right kind of units. Utilization reports constitute a substantial competitive advantage and are based on knowledge of different marketplaces and their respective needs.  A review of plaintiff's exhibit 522 shows that an Atlanta fleet does not fit Charlotte and a Charlotte fleet does not fit Atlanta.  For example, Charlotte has 3 times (19) more 90-foot booms than Atlanta (6).  Thus, the Court concludes that this type of information about fleet mix is a significant competitive advantage and gives a competitor an advantage if it knows the requirements of specific markets in general and specific customers in particular.  Accordingly, allocation of dollars to purchases of specific equipment is indeed critical.  The immediate, high utilization rates and profits achieved by H&E as its branches opened confirm that H&E used confidential information from BPS to establish and set up their fleets in each of the markets in which it opened, just as Defendants Hepler and Kline stated in the AES plan and as Quinn and Christensen did every day for BPS.

{113}   Examples of the Court's concern with respect to credibility include, but are not limited to, the following examples:

(a)      Hepler specifically testified that at the January 6, 2000 dinner in Atlanta he did not solicit or recruit the BPS personnel present for H&E.  He is flatly contradicted by Quinn on several points, including the following:

> Q:  Did Mr. Hepler tell each of these gentlemen [Messrs. Alexander, Leavell, Cornett, Franz and Brown] that he would like to employ them in his new venture?
>
> A:  I don't know that it was told specifically to each on individually.  I don't recall *how he worded it other than he would like to have all of them with this – to be part of this new venture*.  (Emphasis added.)

(b)   Engquist testified:

> Q.  Mr. Engquist, in your experience, how quickly could JLG deliver equipment to the H&E branch?
>
> . . .
>
> Q.  For example if you ordered something on Thursday when would it get there?
>
> A.  It would probably get there *Monday*, *Tuesday*.  They had availability of equipment.

Defendants' order log sets forth the order date and the receipt date for all of H&E's AWP equipment orders to JLG and Genie.  A casual review shows that occasionally each manufacturer did deliver on a few days' notice.  However, a more thorough review reveals that Engquist grossly exaggerated delivery times.  The average time from order date to actual receipt based on Defendant H&E's *own* documents shows that the *average delivery time* of Genie was 28.9 days and JLG 44.5 days – vastly different than "Thursday" to "Monday or Tuesday."  Additionally, H&E's initial orders for Atlanta, for the period from February 25 through April 15, 2000, totaled 467 units comprised of over 30 different product models (including options)—a very large order, apparently intended for more branches than just Atlanta.  Approximately 1650 rental items were ordered as reflected by the

log, comprised of approximately 58 different JLG models and 42 different Genie models (including options). The two most popular such models appear to be models 1932E2 (208 were ordered) and 2032E2 (121 were ordered). These models' popularity suggests that they are staples in a fleet, yet their average delivery times were each 54 days from the date of order. These delivery times, based on H&E's order log, confirm the testimony of Guy Ramsey, the industry expert, on lead times.

(c)      Hepler's expense reports concerning the February 22, 2000 breakfast in Fort Myers directly contradict his testimony about soliciting salesmen with Jones.

{114}   The defendants used their knowledge of BPS information in the hiring and recruitment of personnel. In virtually all cases, employees hired from BPS by H&E occurred after salary increases were offered. Hepler, Kline, Quinn, Christensen and Pearsall used their knowledge of the skills, training, experiences and relationships of BPS employees in selecting and hiring those employees.

{115}   BPS's accumulated confidential information concerning its average rental rates, average rental rates per type of equipment, utilization reports per type of equipment, salary information, employee revenue by headcount and similar information had significant value to BPS was developed over several years, was not readily available in the marketplace and could not be easily obtained through legitimate means without great cost. Defendants used their knowledge of that BPS information in the Hi-Lift business plan.

### The H&E Branches

{116}   The Court will now review each H&E branch in the order that evidence was presented. The Court finds that the evidence confirms a common pattern in H&E's opening of a number of the branches that had known intentional adverse consequences on the corresponding BPS branch. The pattern can be summarized as follows:

(a)      Hepler, Kline and Engquist decide to open a branch in a particular market.

(b)      Hepler, using his past relationship with, and knowledge of, BPS's branch managers, and with the assistance of Quinn and/or Christensen, recruits the BPS branch managers.

(c)      Hepler, with Engquist's approval, employs the BPS branch manager and directs that he recruit and employ on behalf of H&E the best BPS personnel from his branch.

(d)      The BPS branch manager, using his prior relationship and knowledge of BPS employees' skills, salary, relationships and training, recruits selected BPS employees to come to work for H&E. The branch manager first recruits the branch's top sales personnel and service manager, and may recruit mechanics and drivers, although, this is usually done by the recruited service manager. Based upon the timing and nature of the departures, the Court finds that many of the employees were recruited by branch managers while the branch managers were still employed by BPS.

(e)      Hepler, either meets directly, or communicates by telephone, with many of those BPS employees in the recruiting process, especially the salesmen.

(f)      The branch manager, sales personnel, service manager and some of the branch personnel all

leave at about the same time to open an H&E branch in the same geographical area, with little or no notice to BPS. Shortly thereafter, the departing BPS employees are followed by other recruited mechanics, drivers and other personnel.

(g)     The H&E branch opens based on financial and fleet information put together by Kline, Quinn and Christensen and has immediate business. The financial and fleet information is based on confidential information gained during their employment with BPS.

(h)     On behalf of H&E, the sales representatives are immediately in the market and soliciting customers, but do not have H&E pricing information or H&E promotional materials. Notwithstanding that, they are able to secure significant numbers of rental contracts for H&E immediately.

(i)     The BPS branch is left in a weakened state. The branch does not have sufficient trained, knowledgeable human resources to respond to H&E's competition, address relationships with customers, or perform the routine service necessary to support the branches relationships with its customers. BPS is required to rush other personnel resources to the branches to react to the emergency.

{117} Based on this pattern, and as will be shown more explicitly in the following findings for each branch, the Court makes these summary findings:

(a)     Hepler's testimony as to the circumstances of his meetings and communications with BPS personnel are contradicted by the recruited employees' testimony, further discrediting Hepler's credibility. Hepler is not a credible witness.

(b)     The fact that each new branch had "80%" utilization within weeks of opening is circumstantial evidence that H&E used BPS's confidential information to tailor its branches' rental fleets without spending the necessary time, money and effort to develop the information itself. The utilization rate is also circumstantial evidence that a higher percentage of the BPS customer base was converted to H&E in the short term.

(c)     In view of the circumstances of this pattern, the Court finds, in the short term, that were it not for H&E's interference with BPS employer relationships, and subsequent solicitation of BPS customers, those customers would have continued doing business with Sunbelt, or, at least, that Sunbelt would have been able to fairly compete for those customers' business, an opportunity they were not afforded after H&E's orchestrated conversion of BPS employees, customers and information.

(d)     BPS, under Hepler and Kline, had built very strong customer relations at the branch level. It would have been natural for those customers to continue doing business with BPS, subject to normal competitive pressures. A new start-up such as H&E could have been expected to take some customers or some business of some customers over time. The mass exodus of key sales employees in each branch with intimate knowledge of the BPS customer base permitted H&E to effectively solicit the business of that customer base while BPS was trying to rebuild its sales force. Organized defection of service people, mechanics, drivers, inside sales reps and credit manager adversely impacted BPS's ability to service its existing customers, thereby facilitating the conversion of their short term business by H&E. The loss of each branch manager left the branch leaderless and adversely impacted the branch's ability to recover from the other defections. The combined departure of the key

employees both took from BPS and transferred to H&E a vast amount of collective knowledge about the business and customers of the branch. That combination gave H&E a competitive advantage it would not have possessed without the organized and orchestrated defections.

**Charlotte**

{118}   The Charlotte Hi-Lift branch opened on or before June 5, 2000, with the following staff from BPS: a branch manager (Brian Pearsall); an inside sales coordinator (William Huntley); a service manager (Pat Muldoon); a branch administrator (Michele Dougherty); a sales representative (Ken Farris); and a driver (Frank Evans). Within a week the H&E Charlotte branch added a BPS master mechanic (Lennie Merrington). Each of these employees came from BPS.

{119}   Although the possibility of a Charlotte greenfield was part of the original AES Plan and was discussed at the H&E board meeting on February 10, 2000, and although a pro-forma was drawn up for Charlotte by May 9, 2000 and Pearsall was Hepler's brother-in-law, the defendants claim that there was no plan to open the Charlotte branch in 2000 until a "chain of events" took place in late May 2000 with Pearsall wanting to leave BPS. Defendants' position is not credible. Although defendants made plans as early as May to open a Charlotte branch, it was the last branch opened. Clearly, defendants felt they could rely on Pearsall to convert himself and other employees to H&E. It was obviously completed in a rush so that it was done before Sunbelt took over and had an opportunity to create a relationship with the employees.

{120}   Defendants' documents and their own witness show that:

(a)      Engquist testified that a decision to open was made by May 9, 2000, because a branch manager, specifically Brian Pearsall, was available;

(b)      Delores Kline, a real estate agent and the wife of Doug Kline, flew to Greensboro, North Carolina on May 9, 2000 (coincidentally the same day Engquist, Hepler and Doug Kline were in Atlanta discussing the Charlotte pro forma), and spent May 9 - 11, 2000 in Charlotte looking for a site for the H&E Charlotte branch;

(c)      Delores Kline's notes indicate she was looking for licensing reciprocity in North Carolina in October or November 1999;

(d)      Engquist signed the certificate to do business in North Carolina on February 25, 2000;

(e)      Hepler discussed opening in Charlotte with Earl Rose on April 17, 2000; and

(f)      159 pieces of AWP equipment, ordered as early as May 22, 2000, arrived in Charlotte between June 6, 2000 and the end of June 2000.

{121}      Meanwhile, Pearsall, Hepler's brother-in-law and BPS's Charlotte branch manager, denied in his deposition knowing about the plan to open an H&E branch in Charlotte until Saturday or Sunday, May 27-28, 2000. Hepler claimed in his deposition that Pearsall called him at home after Pearsall had a discussion with Bruce Dressel at Sunbelt's Vendorfest, which was held over Memorial Day weekend in May 2000, and that this call, which occurred on either May 27 or 28, 2000, was the beginning of the chain of events which led to the opening of H&E's Charlotte branch — eight  days later with a facility and a full staff.

{122} Pearsall, although a resident of Charlotte, did not testify at trial and was present in Court several days. In his deposition, he stated that he called Hepler and "told him that I wasn't going to, I couldn't work for Sunbelt and at that time he [Hepler] asked me if I could, if I wanted to work with, with H&E." Hepler, on the other hand, testified at trial that Pearsall called Hepler "and said could you hire me? I would like to come to work for you."

{123} In fact, Pearsall and Hepler had been in regular communication from as early as January 14, 2000. Between January 14, 2000 and March 18, 2000, Hepler called Pearsall at least eight times, including three phone calls Hepler made to the BPS Charlotte office totaling approximately 37 minutes. In view of the events occurring by May 9, it is highly improbable that Hepler and Pearsall had no discussion of a Charlotte branch before May 27 or 28.

{124} The Court does not find the testimony, by deposition, or in person, of either Hepler or Pearsall to be credible when taken in light of the totality of the evidence. Moreover, Pearsall's failure to testify calls into question his ability to rebut the testimony of several Charlotte branch witnesses about his statements and activities.

{125} Pearsall turned in an oral resignation on May 30, 2000 and a written resignation on May 31, 2000. Pearsall said he talked to Hepler again on the night of May 30, 2000, but not again until at least June 5, 2000. In his written resignation, Pearsall agreed to work a two-week notice.

{126} As part of, or in lieu of, that notice, Pearsall agreed to help manage the inventory of the Charlotte branch, which was to be conducted in conjunction with the acquisition of BPS by Sunbelt, during the week and weekend, following Memorial Day. Traditionally, James "Rocky" Busic was in charge of the inventory for the scaffolding side of the Charlotte branch. Although the May 2000 inventory was not a regularly scheduled inventory and Busic had scheduled vacation during that time, Busic approached Pearsall and asked to reschedule his vacation for the July 4, 2000 weekend so that he could participate in the inventory. Pearsall insisted that Busic take his scheduled vacation and said to Busic "[W]hy do you care about this inventory? They [Sunbelt] don't care anything about you."

{127} At Pearsall's insistence Busic took his vacation, only to return 8 days later on June 5, 2000, to find the branch in a state of "chaotic disorder." Pearsall did not help with the inventory as promised and left inexperienced BPS employees to do the inventory. Busic was forced to re-do the inventory a few months later, spending three days rather than the usual four hours doing the inventory because it had not been done accurately in May 2000.

{128} Pearsall also incited the BPS employees, apparently in an effort to rally them to the H&E side, or any side other than BPS, by repeatedly disparaging Sunbelt to other BPS employees. Pearsall told BPS employees, while he was still employed at BPS, that Sunbelt "was not a company you want to work for," were "dirt bags," "didn't have a good reputation about their people," that the BPS employees might "want to find another job," that the branch would be run into the ground within "30 to 60 days," and that Sunbelt "was buying all the assets [of BPS] and not necessarily the people."

{129}   Defendants hired at least five BPS/Sunbelt employees for the H&E branch in Charlotte immediately before the date of Sunbelt's acquisition; they solicited and tried to hire several more. Pearsall directed many of the "key" Charlotte BPS employees to leave BPS immediately. While still a BPS branch manager and on site at the BPS Charlotte branch, Pearsall offered jobs at H&E to two salesmen (Farris and Huntley), the service manager (Muldoon) and the branch administrator (Dougherty), all of whom claim to have accepted on the spot, and three of whom Pearsall immediately sent to work for H&E. Engquist and Hepler testified that this very conduct would be improper.

{130}   Farris and Muldoon, the top salesman of the entire BPS organization and the Charlotte branch manager respectively, turned in their resignations on May 30, 2000. Pearsall directed Farris to leave the same day he resigned. He told Muldoon to leave on the morning of June 1, 2000, prior to Muldoon working a two-week notice and the same day Sunbelt acquired BPS.

{131}   Likewise, although Huntley's resignation letter offered a notice period, Huntley never returned to BPS after May 31, 2000. Instead, he showed up for work at H&E on June 5, 2000, and immediately began calling on BPS customers. Pearsall testified in his deposition that he told Huntley to make a clean break and leave immediately–a discussion Engquist admitted was improper, particularly for a manager who was also departing for the same competition.

{132}   Bruce Funderburgh was approached by Pearsall approximately 2 to 2 ½ weeks prior to the acquisition of BPS by Sunbelt. This solicitation was well before Pearsall claims to have called Hepler regarding a job at H&E (on May 27 or 28, 2000), and in fact coincides more logically with Ms. Kline's visit to Charlotte to secure a location for the Charlotte H&E branch in early May 2000. In that conversation, Pearsall told Funderburgh that he was going to start a new H&E branch and that several other BPS employees, including Muldoon, Dougherty, Frank Evans, and Ken Farris, would be going with Pearsall to H&E. The Court finds Mr. Funderburgh's testimony to be credible.

{133}   At trial and in his deposition, Hepler testified that he had no discussion with Pearsall about hiring any other BPS employees until Pearsall worked out his notice and came on board with H&E, despite the fact that Pearsall did not come on board with H&E until at least June 5, 2000. By that time, at least four other BPS employees had been recruited and put to work as H&E employees by Pearsall and Hepler.

{134}   The Court finds that, contrary to his testimony, Hepler knew of and was involved with Pearsall's recruitment of BPS employees. Hepler spoke to Farris on the day Farris resigned and was fully aware that Pearsall was recruiting BPS employees at that time, which was long before Pearsall left BPS on June 5, 2000. Specifically, the Court finds that on May 30, 2000, after instructing Farris to leave BPS immediately, Pearsall instructed him to call Hepler. Furthermore, Farris spoke to Hepler in Jacksonville at that time for the purpose of organizing the start up of the Charlotte branch six days later.

{135}   Further undermining Hepler and Pearsall's testimony concerning the timing of the opening of the Charlotte H&E branch and their recruitment efforts, Patrick Muldoon, the BPS service manager for Charlotte, was also involved in helping to solicit employees for H&E long before he left BPS. Muldoon solicited Rick Bailey, the BPS shop foreman at the time, well before the end of May 2000:

Q: "You had been talking about H&E moving into the area with Mr. Bailey over a period of weeks prior to the time you left, hadn't you?"

A: "It may have been weeks because we knew about H&E coming to the area opening branches. It may have been weeks before that, yes."

{136} Muldoon told Bailey that Pearsall and several others would be starting a new H&E branch in Charlotte and that it was going to be a smaller operation but that "basically, everything would stay the same . . . [that they] would be doing the same thing in a different place." Muldoon also suggested that Bailey go look at the H&E branch a week or so before he left.

{137} Muldoon also solicited Lennie Merrington, a master mechanic, on behalf of H&E. Merrington came to work at H&E on June 9, 2000, despite the fact that his official termination date from BPS was not until June 19, 2000.

{138} Later, Muldoon, on his last day of work at BPS, solicited Ron Chambers, a road mechanic who worked on customer owned machines, to come and work at H&E. Muldoon asked Chambers for his phone number and told him that they were "going to try and keep . . . the A Team together." Muldoon subsequently called Chambers at home, offered him a position at H&E, and told him that they were going to pick up two service trucks for the Charlotte H&E branch.

{139} Pearsall also, either directly or indirectly, solicited the employment of BPS road mechanics Milton Turner and Ron Chambers, and shop mechanics Reggie Gill and Bill Mann.

{140} Plaintiff called a number of Sunbelt BPS employees who testified, and demonstrated by the fact that they stayed on and gave Sunbelt an opportunity to compete for their talents, that the timing of the recruitment had significance.

{141} All in all, when the smoke from Pearsall's departure had cleared, at least nine of the BPS employees had left and gone to H&E before the first week of Sunbelt's ownership of BPS was over. If Pearsall had been successful in employing each of the employees he solicited or who were solicited on his behalf, the AWP side of the Charlotte BPS branch would have lost more than 15 employees.

{142} The Court finds that Pearsall used his position and influence over the employees of BPS and his knowledge as to their skills, salary and training to sow the seeds of fear and doubt with respect to Sunbelt and use that fear and doubt to solicit them for the new H&E branch and interfere with their relationships with BPS and Sunbelt. The Court further finds that without Pearsall's disparagement of Sunbelt and his insistence that the employees leave immediately, before Sunbelt could come in and fairly compete and bargain for their continued employment, some, if not all, of the employees who left for H&E would have remained in the employ of Sunbelt, at least for a sufficient period of time for Sunbelt to compete for their employment on a level playing field or assist in training their replacements. Their continued presence would have eliminated many customer problems.

{143} Further, without his "inside" position with respect to the employees, the Court doubts that Pearsall would have been able, particularly without any increase in salary, and in the guise of a "lateral" move, to convince

so many long-term employees to leave BPS.

{144} The impact of the departure of these employees on the Charlotte branch was significant, as the remaining employees were required to take on additional responsibilities and work long hours to try to compensate for the departures. The branch was unable to get equipment out to customers on a timely basis because of the lack of trained personnel, including mechanics and drivers; equipment out on rent sat for prolonged periods after it was off rent because of the lack of availability of truck drivers to pick up the equipment.

{145} Customer complaints increased significantly. Sunbelt did not have a viable sales force in the field to counter H&E's sales effort in Charlotte. This situation exacerbated customer confusion.

{146} Once Pearsall had taken a full complement of employees and information to start the H&E branch, he left the BPS office in a state of chaos and disorder, without proper documentation, without a proper inventory having been conducted, and without enough information for the remaining BPS employees and new Sunbelt employees to service and deal with BPS customers. These actions of defendants caused BPS/Sunbelt to lose customers. The Court finds his actions, and the actions of H&E and Hepler in their support, were intended to put the BPS branch in a state where it could not properly compete for either its employees or its customers in the early days of the H&E Charlotte branch.

{147} Having left the branch in a state of disorder, Pearsall and the other former BPS employees immediately targeted BPS customers.

{148} Farris and Huntley called on, and solicited orders from, BPS customers within the first 48 hours of their resignations from BPS. Both acknowledged that they were put immediately back into their former BPS territories by H&E, that they had no literature, equipment, or pricing information for H&E, but that they were able to secure orders for H&E immediately. Huntley immediately called on Universal Drywall, a BPS customer; Freeman Mechanical, a BPS customer; Davis Erecting, a BPS customer; Delta Electric, a BPS customer; and Drywall Carolina, a BPS customer.

{149} The Court finds that much of Huntley's testimony was not credible. His trial testimony was contradicted by his deposition testimony, and both were contradictory at times.

{150} Farris immediately went to BPS Charlotte's largest job site–Corning in Midland, North Carolina, and began calling on customers of BPS at that site. Mr. Farris obtained orders from BPS customers, on behalf of H&E, as early as June 1, 2000, before the H&E branch was open. In fact, Kline's June 2000 e-mail to Bruckmann confirms that defendants' expected Farris to switch over the Corning customers.

{151} Farris also acknowledged that he had no pricing or other H&E information when he went to call on BPS customers. In fact, Farris called on BPS customers on behalf of H&E while he was still employed by BPS. Farris testified that he began his employment with H&E on May 31, 2000, and he submitted his letter of resignation to BPS on May 31, 2000, but he also acknowledged that he solicited customers at the Corning site on behalf of H&E on May 30, 2000.

{152} Further, Farris's acknowledgment of receipt of the H&E policy handbook is dated May 31, 2000 and is signed by Brian Pearsall as Farris's H&E supervisor, despite the fact that Pearsall was still employed by BPS

on May 31, 2000.

{153}   Farris obtained orders from the following BPS customers within a week of H&E's opening: Interstate Electric (order date 6/6/00); Rental Supply (order 6/7/00); Capital City Steel Erectors Supply (price quoted was "off the seat of [his] pants); Gulf State Electric, Supply (order 6/6/00); Environmetrics (order 6/7/00); Howard Brothers Electric.  Farris's relationships with these customers were developed while he was employed at BPS.

{154}    The Court finds that many of these customers from which BPS lost business had long standing relationships with BPS.  These customers would have given Sunbelt the opportunity to compete fairly for their business with H&E, an opportunity that H&E's actions may have prevented in some cases.

{155}   H&E's new Charlotte employees could not, at least in the beginning, have used the "Dodge" reports to find and secure new customers for H&E.  The new H&E branch did not have credit applications and related paperwork when it began taking rental contracts.  Credit information is an essential part of doing business when dealing with expensive equipment like the kind at issue here.  The only way H&E could have done business was in reliance on the BPS credit information known to the former BPS employees hired by H&E.

{156}   Therefore, the Court finds that H&E used customer information brought to it by the BPS employees it brought on board immediately—including pricing information, customer information, credit information and information related to prospective and upcoming jobs—in order to solicit and secure jobs.

{157}   The Court finds that there was sufficient evidence to show that BPS considered the compilation of its customer information, which took considerable time, money and effort to compile, to be confidential. Further, the Court finds that BPS took reasonable efforts to maintain the confidentiality of that information, including maintaining passwords on the computer system, not giving each employee a password, shredding of confidential documents, and requiring each employee to sign an employee handbook with a confidentiality provision.

{158}    Finally, the Court also finds that the BPS employees who left *en masse* and went to H&E had an opportunity to acquire and know the confidential information and to use it at H&E.

**Orlando**

{159}   The Orlando Hi-Lift branch opened on or about May 22, 2000, with the following staff from BPS: a branch manager (Wellington "Duke" Drennan); BPS's complete AWP outside sales staff   (Jay Kiefer, Mark Stuckie and Jeff Hansen); a shop foreman (Michael Waldrop); mechanics (Todd Chesser and Scott Waldrop); a credit manager (Patricia Uddo); a branch administrator (Brenda Drennan); and a driver (Henry Garver).  Shortly thereafter, the H&E Orlando branch added an inside sales coordinator (Andrea Ussery) and another driver (Donald Henderson).

{160}    After a conversation with Hepler at the 1999 national sales meeting in Dallas, Duke Drennan ("Drennan"), the BPS Orlando branch manager, told some of his employees that Hepler might start a company of his own and that this might be a possibility for future employment.  The employees to whom Drennan made these comments—Jay Kiefer ("Kiefer"), Mark Stuckie ("Stuckie"), Jeff Hansen ("Hansen"),

Patty Uddo ("Uddo"), Peter Casey ("Casey"), Brenda Drennan ("B.Drennan"), Steve Hicks ("Hicks") and Andrea Ussery ("Ussery")—all later left BPS to work for H&E.

{161} Hepler called Drennan at the BPS Orlando branch in March 2000. Drennan testified that he likely informed Kiefer, Stuckie, Hansen, Uddo, Casey and Hicks of this conversation with Hepler. Hepler's telephone records reflect an eight-minute telephone call to the BPS Orlando branch on March 29, 2000.

{162} Drennan resigned from BPS on April 29, 2000 and left BPS on May 4, 2000. Drennan's employment offer from Hepler included a salary of $105,000, higher than his salary at BPS, as well as a $25,000 signing bonus.

{163} Hepler's H&E expense records reflect meetings with Drennan in April 2000 to discuss H&E, including Tampa and Orlando branch locations and operations. These records reflect such meetings prior to Drennan's resignation from BPS. For example, Drennan, while still employed by BPS, again had dinner with Hepler on April 13, 2000 at Christine's restaurant in Orlando along with Delores Kline and Mike Quinn. Hepler, Quinn and Delores Kline were in Orlando to look at potential properties for an H&E facility in the area.

{164} All of the employees that Drennan solicited on behalf of H&E in April, May or June of 2000 were BPS employees.

{165} While still a BPS Orlando branch manager, Drennan did the following:

(a) In April 2000, Drennan, after conferring with Hepler, invited BPS employees Kiefer, Stuckie, Hansen, Uddo and Ussery to have dinner with him and Hepler. Drennan met with these employees separately at BPS, informed them of his intent to leave BPS if Hepler offered him a job at H&E, and invited each individual to attend the dinner at the Orlando Ale House.

(b) Drennan testified that at this dinner Hepler discussed the prospect of H&E opening a facility in the Orlando area. Hepler ended the dinner by saying he would further explore the possibility and it was agreed that they would continue the discussion in the future. Of course, Hepler testified that they did not discuss the possibility of an H&E Orlando branch at this dinner. Drennan's testimony contradicts Hepler's testimony about this dinner. The Court finds that Hepler's testimony is not credible and he used this meeting to recruit BPS employees to H&E with Drennan's assistance.

(c) Prior to the Orlando Ale House dinner, Ussery never heard anyone at the BPS branch express a desire to leave BPS. He testified: "[W]e all loved working there." The pending sale of BPS was a subject of curiosity, but not a great concern: "We had already gone through a sale one time, and nothing changed. It was just curiosity. Everybody was just curious."

(d) Drennan admits that he openly criticized BPS in conversations with his employees and discussed his plans with regard to Rob Hepler.

(e) Drennan, following the April 2000 meeting with Hepler, assisted BPS employees Kiefer, Stuckie, Uddo, Hansen and Ussery in communicating with Hepler regarding employment with H&E and the details of such employment. Hepler authorized Drennan, prior to Drennan leaving BPS, to offer employment with H&E to BPS employees and set their H&E salaries. Drennan did just that, discussing H&E employment with BPS employees while still the BPS Orlando branch manager of. The salaries Drennan offered on behalf of H&E were consistently higher than the salaries Drennan paid such employees at BPS. Defendants, with the assistance of Drennan, recruited and hired 12 BPS employees required for H&E's start up (17 total).

(f)     Drennan talked to Kiefer, who already had resigned from BPS, about setting up a boom for an H&E customer and contacting the necessary personnel to help place the boom on the job site for the customer. Drennan gave Kiefer the authority to get help with the boom and referred Kiefer to Mike Quinn. The boom was on the customer's job site before Drennan left BPS.

(g)     Drennan, upon being asked by one of his BPS employees if he would hire her boyfriend to come work for H&E, told her that he could not approach any employees but it was all right if employees approached him. The BPS employee in question subsequently approached Drennan at BPS, and Drennan offered him a job at H&E. Clearly, Drennan knew that recruiting for his employer's competitor was wrong.

{166}  Drennan took confidential business files of BPS with him to H&E, including BPS monthly goals, rental revenue information, salary/wage reports and a spreadsheet reflecting average salaries, and returned those files only after the lawsuit was filed.

{167}  Not only did Drennan take confidential files and solicit other BPS employees while he was employed at BPS, he also encouraged at least one employee to bring valuable, confidential BPS information and documents with him.

{168}  In late March 2000, Drennan solicited Rick Breinlinger ("Breinlinger") at the BPS branch. Drennan first approached Breinlinger at the BPS branch and told Breinlinger that he was moving to another company where he would be working with Hepler and wanted Breinlinger to come with him. Drennan said that other BPS employees were also going with him and that Breinlinger was not to say anything to anybody. Drennan said that he would get back to Breinlinger about the details, which he did. He called Breinlinger at home and invited Breinlinger to his house to discuss the details of the H&E offer. Breinlinger met with Drennan at his house on a Sunday afternoon, at which time they discussed the position, salary and vacation time H&E, through Drennan, was offering Breinlinger. At this meeting they also discussed the location of the H&E facility and other BPS employees who Drennan had solicited from BPS. Drennan asked about Breinlinger's BPS service log book, which contained detailed information about customer contact information, how such customers conducted business, and repairs performed for customers. He told Breinlinger to bring the service log book with him to H&E. Drennan reiterated at this time the importance of keeping the matter quiet and not discussing it with anyone. Drennan ultimately retracted the H&E offer when Breinlinger refused to leave BPS without giving a two week notice. Drennan admits he solicited Breinlinger to leave BPS to work for H&E.

{169}  Defendants did not call Drennan as a witness to rebut or deny Breinlinger's testimony.

{170}  H&E salesmen in Orlando were not provided any guidance or parameters with regard to pricing on behalf of H&E. H&E Orlando did not even compile price lists until 2001. Prior to that time, H&E salesmen were expected to quote prices to customers based on "information in their head." Drennan has never spoken with Hepler or anyone else in Hi-Lift's corporate office about pricing. He has always set the prices for his branch.

{171}  The territories covered by H&E salesmen were territories that they had covered on behalf of BPS, and they immediately called on the customers and job sites based on information acquired while employed by

BPS.  For example, as soon as Kiefer resigned from BPS, he called on R.C. Aluminum, a BPS customer at the Hard Rock Café job site, a major project that he covered for BPS.  Regarding the order he received from R.C. Aluminum that first day, Kiefer testified, "I didn't write it up at all.   I mean, I knew the account and knew R.C. Aluminum, the job." He did not even ask for a credit application from R.C. Aluminum, despite H&E's alleged policy of obtaining a credit application from every customer.   On behalf of H&E, Kiefer called on every trailer on the Hard Rock job site, each of which he had called on for BPS.

{172}   Drennan admits, and H&E business records show, that he has personally entertained and solicited former BPS Orlando customers on behalf of H&E.

{173}   The departure of Drennan and other BPS employees in such a short period of time left the BPS Orlando branch understaffed, lacking experienced personnel, unable to service customers as it had prior to H&E's raid on the branch, and caused the branch to lose considerable business from longstanding customers.  Further, without Kiefer, Stuckie and Hansen, its entire AWP sales force, the branch's business slowed considerably, and many of its high volume customers began calling BPS equipment off rent and stopped renting equipment from BPS.

**Tampa-Fort Myers**

{174}   Prior to May 2000, H&E did not have a presence in the Tampa-Fort Myers market.    The H&E branches established in Tampa-Fort Myers were greenfields.

{175}    The Tampa and Fort Myers Hi-Lift branches opened on or before May 8, 2000 and June 5, 2000, respectively, and were staffed with the following BPS personnel: a branch manager (Beare Jones); sales reps (John Andrachak, John Breadmore, Wade Bercaw, Scott Strawn, Jason Jones and Brian Ditoro); a service manager (Doug Ashmore); inside sales coordinator (Bonnie Quasnick); drivers (James George, Jonathan Brunelle, and Charles Heim); an officer manager (Belinda Harrison); a shop foreman (Ronald Good); field mechanics (Timothy Poole, Billy Marshall, and John Clark); an erector superintendent (Nicholas Cooper); a shop mechanic (John Taylor);  erector foremen (Leon Beebe, Scott Price, and Mark Roesler); and erectors (Larry Brown, Charles Cansdale, and Eric Ruzycki).  Each of these employees were hired from BPS.

{176}   The market for trained and experienced drivers, mechanics and salesmen in Fort Myers and Tampa in 2000 was very tight. Trained and experienced employees were then difficult to locate in these markets.

{177}   BPS had existing branches in Tampa and Fort Myers in January 2000.  BPS had opened up the Tampa branch in or about 1996 as a greenfield.  Hepler testified about the steps undertaken at the time to create that greenfield.  None of those steps were repeated when H&E opened up its Tampa branch in May 2000.  Instead of placing advertisements in the newspaper for employees, H&E used secret meetings with Hepler, branch manager Beare Jones and service manager Doug Ashmore to solicit employees.  Instead of building slowly as business warranted, H&E opened with a full complement of employees.

{178}   Jones claims that when he learned of Defendant Hepler's December resignation he was "shocked" by the news, that it "stopped [his] heart," and that, despite the fact that Hepler was like a brother to him, he did not speak to him at all for 60-90 days after Hepler departed.

{179}   The evidence shows that contrary to his sworn testimony, Jones spoke with Hepler repeatedly throughout the time period prior to Hepler leaving BPS for H&E, including three times on January 3, 2000, a thirteen minute conversation on January 13, two conversations on January 18 (4 and 6 minutes respectively), an eleven minute call on February 17, three calls on February 21, two calls on March 29 (including a seven minute call), an April 4 call for twelve minutes, a thirty-five minute call on April 11 and three calls on April 12. For this and other reasons stated below, the Court does not find Jones's testimony credible and notes that he did not testify at trial.  Jones, Hepler and Hepler's father had been close friends and business associates for decades.

{180}   On February 22, 2000, a meeting occurred in Fort Myers attended by Hepler, Jones and the BPS sales staff in Fort Myers and Tampa.  H&E's business records reflect that the purpose of the meeting was to "discuss H&E employment offer with Jones and sales staff."  Hepler submitted that receipt for his breakfast to his employer and was reimbursed for the expenditure as a proper business expense.  Moreover, Hepler's attempt to excuse the clear statements on the H&E expense report for this meeting by laying blame on his secretary is not credible.  Ms. Parnell's testimony is clear that she always tried to be accurate, took the information that was given to her by Hepler to place on the report, did not add her own musings, and had no reason to believe that the information was inaccurate. Hepler also admitted that he never called anyone in Baton Rouge and told them anything was inaccurate or needed to be changed in the report.

{181}   Jones admitted that he invited BPS employees to attend the meeting with Hepler on February 22, 2000. Former BPS employees Wade Bercaw, Scott Strawn, John Andrachak and John Breadmore all met at this early morning breakfast meeting in Fort Myers.  Their claim that it was a casual, non-business breakfast among old friends is not credible. Kevin White, branch manager of Sunbelt in Fort Myers, testified that Bercaw stayed with him in Fort Myers the previous night and explicitly told him that he would be meeting with Jones, Hepler, Andrachak, Breadmore and Strawn the next day about starting a new business in Florida.  White was credible, and his testimony is confirmed by H&E's business records.  His testimony is also confirmed, in part, by Bercaw, who testified that he knew the night before the meeting that Hepler, Jones, Andrachak and Strawn would be there and that it would be held at the Shoney's.  White also testified that in a later conversation he was told by Bercaw that he was offered a job by Hepler at that breakfast. White's testimony is also confirmed by the fact that Bercaw telephoned him some months later, after learning that White had disclosed this meeting to Sunbelt's CFO, to express his displeasure with the fact that he had disclosed this clandestine meeting.    The Court finds White's testimony credible.  Bercaw's testimony, denying that the purpose of the meeting was for employment, is not credible.

{182}   The testimony of Hepler and Jones regarding this February 22 meeting is inconsistent in significant respects.  Hepler testified several times that he knew nothing about the fact that others would attend this breakfast meeting until the morning when Jones picked him up.   Jones testified, however, that he discussed having these people attend when Hepler first called him to tell him he would be traveling to Fort Myers, several days before the breakfast meeting occurred.  Hepler and Jones are not credible in their denials as to the purpose of the meeting.  Hepler recruited Jones to H&E, and then, with Jones's assistance while Jones was still a BPS employee, readily recruited other BPS employees for H&E.

{183}   Jones had knowledge of Hepler's efforts to start new branches in Tampa and Fort Myers for H&E and was an active participant in a plan to hire BPS employees to go to H&E in Tampa and Fort Myers and to start-up the new branches.

{184}   In the span of thirty days, Jones, Bonnie Quasnick (the Tampa inside sales coordinator) and Hepler solicited and hired 25 experienced BPS employees from BPS's Tampa and Fort Myers branches; over 90 percent of the H&E work force came from the Tampa and Fort Myers BPS branches.  Jones testified that as the H&E branch manager, he would have a say in the employees and structure of the branch and admitted that outside sales persons, inside sales persons and the service manager are essential to a new branch. Jones reviewed these employees while at BPS, was knowledgeable of their BPS salaries and knew these employees to be good performers These employees were hired for similar positions at H&E and offered a salary increase to leave BPS.  As of January 1, 2001, twenty-six of H&E's 35 employees in Tampa/Fort Myers were former BPS employees.

{185}   Jones's denials of knowledge and involvement in the defendants' plan to recruit employees *en masse* from BPS to H&E and switch customers are not credible.

(a)      Evidence shows that at the time Jones filled out his application for employment with H&E he listed the position as branch manager for Tampa and Fort Myers and he also indicated that he would not relocate from Fort Myers.

(b)      Jones also claimed to have been dissatisfied with BPS after Hepler left.  Nevertheless, H&E gave him a $14,000 salary increase and a $25,000 sign-on bonus to leave BPS to go to work for H&E.

(c)      Jones claims that at the time he resigned there was no BPS plan to open a Fort Myers branch, only a Tampa branch.  In addition to the admission on his H&E application, Jones hired two employees, Andrachak and Breadmore from the BPS Fort Myers branch—both of whom indicated in their H&E employment application that they would not relocate from Fort Myers.

(d)      Jones testified that he had no involvement in the location of the H&E branch in Tampa.   Kline also denied having spoken with Jones when he went to Tampa in February 2000.  Evidence shows, however, that Jones was in contact with Defendant Kline right before Kline' February 27 trip to Tampa and signed a letter of intent for the rental of property for the H&E Hi-Lift branch.

(e)      While still a BPS employee, Jones also met with Hepler on April 26, 2000, to discuss "Tampa operations," and he met with Hepler on May 17, after he had resigned, to finalize the recruitments of Breadmore, Andrachak and Quasnick.

(f)      Moreover, defendants' action in ordering AWP equipment for Tampa confirms the prearranged plan.  On March 31, 2000, defendants placed an order for 99 units for Tampa with JLG. As confirmed by the events in almost each location, defendants would not have placed such an order without the branch manager (Jones) in place.

{186}   BPS employees in Tampa were also recruited by Doug Ashmore, the former BPS service manager under Jones.  Billy Marshall, Ron Good and Timothy Poole, all experienced   service mechanics, worked under

Ashmore. Ashmore testified that it was important to the business to have experienced mechanics. All three of these mechanics were hired the same day by H&E; Good and Poole left BPS without notice in the early morning hours on June 1. Sunbelt did not have the opportunity to speak with these employees about continued employment at the branch.

{187} Ashmore denied, under oath, that he solicited any employees to leave BPS for H&E while employed at BPS. Billy Dobbs, who Ashmore claims is a trusted friend and worked under Ashmore, testified that Ashmore solicited him as part of the "chosen few" for H&E while Ashmore was still with BPS. Dobbs also testified that the mechanics agreed that they would leave early in the morning, Monday, June 1, without notice. Libby Oleson, an assistant to the inside sales coordinator and Quasnick, also testified that she had conversations with Ashmore during the time he was employed by BPS. These conversations show that he had been coordinating with Jones regarding the solicitation of BPS employees for the new H&E branch.

{188} The testimony of other former BPS employees in Tampa and Fort Myers, now H&E employees, is not credible, and further supports a finding that the defections were planned and orchestrated while the current H&E employees were still BPS employees.

(a) Andrachak and Breadmore, former BPS sales representatives from the BPS Fort Myers branch, and now H&E employees, testified that they resigned from BPS without a job offer from defendants. Breadmore was the sole breadwinner for the family, and he and his wife required insurance through his work. Both testified that, although they did not know the purpose of their trip to Tampa, they traveled two and half hours from Fort Myers to Tampa to meet with Jones and Hepler and while in Tampa they were offered a job, which they accepted. At the time they accepted the offer, they supposedly did not know anything about the job or where it would be located, even though they were not willing to move from Fort Myers. Finally, although testifying that when they left BPS they did not have an offer in hand, their employment applications with H&E state that the reason they left BPS was for a "new" or "better" job.

(b) Andrachak's employment termination date with BPS was May 26, yet Andrachak submitted an expense report to H&E for reimbursement of expenses incurred beginning May 15.

(c) Similarly, Quasnick's last day of work at BPS was May 22, 2000 (with a termination date of June 2), yet she signed her both her W-4 and H&E employment application on May 19, 2000. The May 19 date on her employment application was crossed out and changed to May 22. Quasnick testified that she did not start at H&E until May 23, 2000. She also testified that when she spoke with Hepler and Jones at dinner prior to her resigning, there was no discussion of Strawn and Bercaw. Jones testified that he told Quasnick at that dinner that he had been speaking with Strawn and Andrachak.

(d) Ashmore filled out his H&E application for employment on May 22 and signed his H&E employee handbook acknowledgment on May 25. Ashmore, however, continued working at BPS until two days after Jude Yimin of Sunbelt had arrived at the branch, all the time soliciting BPS employees to leave the branch for H&E.

{189} After successfully bringing over the BPS employees, defendants immediately began building a revenue stream by targeting longstanding customers of BPS in Tampa and Fort Myers and "switching" them over to H&E. Evidence shows, and Jones admits, that efforts were made by H&E to switch customers from BPS to H&E almost immediately following the departure of the BPS employees to H&E. The evidence also shows that BPS had longstanding customers in Fort Myers (customers of BPS as early as 1994 and 1995 when White was employed at BPS) and Tampa and that relationships between sales representatives with customers

was fostered by BPS. In May and June 2000, the BPS branches experienced a decline in AWP lease contracts while H&E experienced a concurrent rise in contracts with these same customers.

{190} Substantial evidence shows that pricing and customer contact information at the branches was confidential information, although customers themselves did not treat pricing as confidential. White testified that he understood that the BPS branch had special or preferred pricing for customers, based on a number of factors, including volume of business given by that customer, and that this information was confidential when he was an outside salesman at the BPS Fort Myers branch under Jones in 1994-95. Bercaw admitted to using special pricing at BPS, which was exclusive for the customer and maintained for at least six months. In addition, the BPS employees who went to H&E signed acknowledgments of the BPS, and later the H&E handbooks, which contained confidentiality sections.

{191} In 2000, BPS was the largest rental company in Fort Myers. By taking BPS employees and leaving the BPS branch in disarray, H&E was able to rapidly gain market share in the Fort Myers' market and BPS lost market share in Tampa at a fast rate.

{192} The massive departure of employees from BPS to H&E in such a short period of time left the BPS (now Sunbelt) branches in Fort Myers and Tampa in a total state of disarray. The H&E employees involved in the solicitation of these employees were indifferent to the impact of their actions on the BPS branches.

{193} The evidence shows that at the time that H&E was contacting BPS customers, BPS was not in a position to compete in the marketplace. Salesmen are vital to the business and act as the company representative with the customer. With the mass exodus of employees from the BPS Fort Myers and Tampa branches, BPS did not have experienced outside sales representatives who knew the customer base and contacts to call on customers and present the facts concerning the acquisition. At the same time, however, H&E had their sales force (the former BPS sales team) in the field immediately calling on customers.

{194} Defendants' conduct was undertaken for the purpose of harming BPS/Sunbelt and gaining a competitive advantage over Sunbelt in the Tampa/Fort Myers markets. In summary, the Court finds the following facts:

(a) Over 90 percent of the H&E employees in Tampa and Fort Myers came from BPS and were hired in a thirty-day period, leaving the BPS branches with virtually no employees. Given Hepler's experience and past involvement in starting up a greenfield branch in Tampa and his knowledge of BPS personnel vulnerabilities, Hepler knew that defendants' actions would have a debilitating effect on the Sunbelt's ability to compete.

(b) Hepler arranged a meeting in February 2000 for the purpose of discussing the opening of branches in Tampa and Fort Myers This meeting was attended by the same BPS employees who became the first employees of H&E. Defendants' and their witnesses' denials that the meeting was for the purpose of recruitment are not credible.

(c) The speed by which H&E established itself in Fort Myers and Tampa, a market in which BPS had significant market share, demonstrates that H&E's actions were calculated as part of a plan. By year-end 2000, H&E had profitable branches in Tampa and Fort Myers.

(d)     Just as Sunbelt was undertaking efforts to recover in Fort Myers by hiring Kevin White as the branch manager, Jones made a threatening comment to him to discourage his taking a job with BPS. Hepler telephoned White to offer him a position in Texas. White had not spoken with Hepler in six years and had not been talking with him about a position in Texas. In fact, White had had no experience in Texas. The only apparent reason for offering him a job was to keep experienced employees from going to work for Sunbelt in Fort Myers.

(e)     Jones denied that he did anything intentional to harm Sunbelt. He testified that proof of his contention was that he had not gone after ICM, the largest industrial customer of BPS in Tampa and a customer that Bercaw described as having a verbal, exclusive partnership with BPS/Sunbelt. In fact, not more than a week after Bercaw started at H&E, he was calling on ICM trying to obtain their business with the full knowledge and support of Jones. When shown his deposition testimony at trial, Bercaw reluctantly admitted that he was trying to establish the same type of verbal, exclusive partnership with ICM that BPS/Sunbelt enjoyed. Contrary to his sworn testimony, Jones personally went after ICM's business; he just wasn't successful in his efforts.

{195}   As a direct and proximate result of defendants' actions, the BPS/Sunbelt branches in Tampa and Fort Myers were left in a debilitated state.

(a)     Experienced employees in the branches, such as Andrachak (outside sales), Breadmore (outside sales), Strawn (outside sales), Bercaw (outside sales), Jason Jones (inside sales), Bonnie Quasnick (inside sales), Brian Ditoro (inside sales), Doug Ashmore (service mechanic), Ron Good (mechanic) and Tim Poole (mechanic), were gone to H&E within days of each other.

(b)     In Fort Myers, the only remaining outside salesman, Tim Kennedy, was moved to the branch manager position, leaving no outside sales staff until the branch hired Scott Williams, who had no experience with AWP rentals, and Frank Hight, who was later terminated for poor performance.

(c)     In Tampa, the only remaining AWP outside salesman, Dennis Carpenter, had only recently moved into that position from his prior position as a driver, and he had no AWP sales experience. BPS/Sunbelt filled the inside sales/dispatch position in Fort Myers with a person who sold copiers and had no AWP experience.

(d)     Drivers and mechanics were hired with no AWP experience.

(e)     As Billy Dobbs testified, positions were filled with just "warm" bodies, sometimes by family members who had no training or experience with AWP's. Libby Oleson moved into the inside sales coordinator position, to replace Quasnick, although at the time Ms. Oleson had no experience in crucial aspects of the job such as setting prices and giving advice regarding the type of AWP equipment best suited to a customer's job. Jeff Brown, who was hired in July 2000 to act as an AWP outside salesman in Tampa, could not take on his sales responsibilities for the first several months because he had to assume other responsibilities—such as assisting Ms. Oleson with the inside sales function, handling field service problems and advising customers on rental needs—caused by the rapid departures of BPS employees for the H&E branches.

(f)     It took the Sunbelt Tampa branch two and a half years to rebuild its sales staff with experienced sales people.

{196}   As a direct and proximate result of the massive departure of BPS employees to H&E in May 2000, the Fort Myers and Tampa branches experienced significant problems with the operation of its business that caused it to lose customers.

(a)     Response time for servicing equipment in the field increased from a matter of hours before the departures to sometimes days. Similar difficulties were encountered in Tampa.

(b)     AWP equipment was not serviced or timely delivered, and customers called in to order

equipment off rent when the jobs had not been completed.

(c)     AWP equipment in Fort Myers could not be located for months.

(d)      Due to the absence of drivers, equipment was not picked up in a timely manner in Tampa, causing additional customer complaints and loss of business.

(e)      Employees in the BPS/Sunbelt branch in Tampa worked long shifts, sometimes 14 to 15 hour days, to keep the branch open.

## Dallas

{197}   As of the beginning of 2000, Defendant H&E did not have a branch in Dallas, Texas that specialized in the sale or rental of equipment. In establishing the budget for the Dallas branch, H&E employees treated it as a greenfield.

{198}   The Dallas Hi-Lift branch opened no later than March 20, 2000 and, within two days of the opening, had the following staff from BPS: a branch manager (Abe Farrington), a service manager (Jeff Billups), outside sales reps (Steve Matthews and Ken Moon), mechanics (Tim Green and Tony Herriage) and a driver (Darrell Herriage). Within two weeks, H&E added another BPS mechanic (Allen Green) and in the next two months, another BPS mechanic (Curtis Billups) and a BPS driver (Chris Brown).

{199}    Christensen, a senior member of the BPS management team, worked out of the Dallas branch and worked closely with Abe Farrington ("Farrington"), who in 1999 became the BPS Dallas branch manager. Christensen left his employment with BPS on January 14, 2000.

{200}    In January 2000, BPS had many experienced and trained employees in the key positions in its Dallas branch. Farrington had been employed by BPS since December 1994 and had been the branch manager since early 1999. Farrington oversaw the other employees of the branch. Jeffrey Billups had been employed at BPS since May 1996. Steve Matthews, an outside AWP sales representative, and Ken Moon, the outside AWP sales representative for industrial accounts, had been employed by BPS since April 1997 and January 1999, respectively. Thomas Green, Allen Green and Tony Herriage were trained AWP mechanics that had been employed at BPS since May 1997, October 1996 and April 1997, respectively. Darrell Herriage, an experienced AWP driver, had been employed at BPS since May 1997. Each of these BPS employees was solicited by Christensen or Farrington and left BPS for employment at H&E in March or April 2000.

{201}   In a span of 35 days, all of these BPS employees were on the payrolls at H&E. With one exception, each BPS employee was offered more money to go from BPS to H&E. For example, Farrington, who accepted employment with H&E no later than March 4, received a $5,000 increase to join H&E as its Dallas branch manager. The fact that H&E had to pay more for these employees to go to H&E belies defendants' contention that these employees left out of concern over their future employment at BPS. Indeed, Matthews testified that he was satisfied with his job at BPS. All of these BPS employees were placed in positions at H&E that were similar to those they held at BPS.

{202}    Christensen also attempted to recruit other BPS employees who did not leave BPS for H&E. For example, Christensen attempted to create a suspended scaffolding department by recruiting Monty Huffman of BPS to join H&E. Christensen intended Huffman to then recruit the two other employees that worked under him at BPS, Robert Landry and Larry Sible. Huffman, Landry, nor Sible left BPS for H&E. H&E did not thereafter, independently, develop a suspended scaffolding business because, as Christensen testified, Mr. Huffman declined his offer and stayed with BPS/Sunbelt. The team of Christensen and Farrington solicited and hired other BPS employees to join H&E during the period of April through September 2000. During that period, they hired six additional BPS employees for the new H&E Branch.

{203}   Hepler and Christensen had conferred with respect to planning a new venture. For example, following Hepler's trip to meet with Rentokil personnel in the United Kingdom in August 1999, the National Sales Meeting occurred for BPS. Christensen and Hepler attended this meeting. During a break at this meeting, Christensen and Hepler took Linda Gomez, an outside AWP salesperson, to the side and asked her about the largest projects going on in the Dallas market and for her thoughts on where to locate a new branch. At the time, Hepler was aware that Rentokil was putting BPS up for sale and BPS was not opening a new branch in

Dallas. Hepler's comment about a new branch could only relate to a new business venture and one about which Christensen knew.

{204} At the same time Hepler and Kline were taking steps to market their new company to prospective investors and meeting with Bruce Bruckmann, John Engquist and Gary Bagley, operations in the Dallas branch began to suffer, providing some circumstantial evidence that attention was diverted from operating the business to the development of a new company. These operational problems increased in December 1999.

{205} Hepler announced his resignation to BPS employees on December 1, 1999 and continued his employment with BPS until December 14, 1999. In his testimony, Christensen attempted to minimize his contacts with Hepler, but telephone records show that Christensen called BPS headquarters in Jacksonville and had lengthy conversations during this period in which Hepler was still employed at BPS. Beginning on December 15 (after Hepler left BPS), Christensen directed his calls to Hepler's cell phone, calling him on numerous occasions leading up to Christensen's termination of his employment with BPS. Telephone records also show that at the same time Christensen was calling the Jacksonville headquarters following Hepler's announced resignation, he also made calls to Farrington and Quinn.

{206} Hepler met with Christensen on December 16, 1999 in Dallas, Texas with John Engquist, purportedly to discuss his employment with H&E. Christensen received a $20,000 salary increase to $125,000 to join H&E and a $25,000 sign-on bonus. Telephone records show that after this meeting, Christensen, Hepler and Quinn had numerous telephone calls with each other and that Christensen continued to call the BPS branch in Dallas. Again, Christensen in his testimony attempted to minimize these contacts. Telephone records show at least 18 calls between Hepler and Christensen during the period of December 15 to January 14, the date Christensen left his employment with BPS.

{207} On January 11, 2000, prior to his January 14 termination date, Christensen telephoned Delores Kline and then began working with her to identify suitable properties in Dallas for the new Hi-Lift branch. These efforts led to Defendant Kline signing a letter of intent for the rental of property in Dallas on February 11, 2000.

{208} No later than January 18, 2000, Defendant Hepler had directed Christensen to begin soliciting experienced BPS employees for the new Hi-Lift branch in Dallas. It was "challenging" to find skilled employees in the Dallas marketplace. Christensen quickly looked to the BPS Dallas branch for these employees. Christensen and Farrington had access to confidential salary information for employees in the BPS Dallas branch.

{209} Christensen never obtained the services of headhunters or placed advertisements in newspapers, but instead used BPS as his primary source for employees. On several occasions in February and March 2000, Christensen met with groups of BPS employees for lunch and dinner recruitment meetings. One such meeting was attended by six BPS employees. Another lunch was attended by three of BPS's outside sales personnel. No persons other than these BPS employees and Christensen were invited or attended these exclusive meetings. The exclusive nature of these group recruitment efforts strongly supports the finding that these meetings were not open to the general public but were part of a plan to seek mass departures of employees from BPS. Christensen interviewed no "candidates," other than Farrington, for the Dallas branch manager slot. Through Christensen and Farrington, defendants recruited and hired nine key BPS employees in Dallas, including its branch manager, service manager, several mechanics and two of its outside salesmen. During at least at one of these meetings, Christensen expressed his negative view of Rentokil's ownership of BPS. All of this conduct is outside the norm of recruitment effort in this industry.

{210} Pricing appeared to have more significance in the Texas market than in other BPS markets. In January 2000, BPS had customers with whom it had longstanding relationships, including Potter Concrete, Mills Electrical, Barnsco, Term Sheetmetal, Walker Engineering, Oak Cliff Glass and Electric, Drywall Interiors, Haley Greer, North Star Fire Protection and Ram Steel. Prior to that time, BPS personnel, including Christensen and Farrington, made presentations to BPS customers to establish special relationships whereby preferential pricing would be provided to these customers and, in return, the customer would provide 100 percent of its business to BPS. One example of such a presentation was that made to Mills Electric. These presentations led to the formation of a "gentleman's agreement" between the customer and BPS. BPS had every expectation that based on these agreements that it would continue to do business with these customers in the future. Among the customers for which these "gentleman's agreements" were established was Mills

Electric and Ram Steel, both of which were in the top five customers for the BPS branch in rental volume in 1999.

{211} The preferential pricing set by BPS for these customers was considered confidential at BPS. Customer contact information was also considered confidential at the BPS branch and gave BPS a competitive advantage over the competition. Christensen told Linda Gomez on various occasions that the pricing was to be hand delivered to insure that the customers understood that the pricing was to be held in confidence. Linda Gomez testified that in her experience customers honored that request and did not share this preferential pricing with BPS competitors under this "gentleman's agreement." Preferential pricing remained in place for a year and then was reviewed to determine whether it should be adjusted. Gomez testified that the special pricing gave BPS a competitive advantage over the competition. Christensen admitted that he would not share any information with a competitor and would not disclose BPS customer information so that it loses its confidentiality and Farrington admitted that he encouraged sales representatives not to disclose pricing to the competition. Christensen, Farrington and Matthews each acknowledged their receipt of the BPS handbook which contained the confidentiality section.

{212} The Court finds Ms. Gomez's testimony to be credible. The Court also notes that Christensen and Farrington did not testify at trial to rebut plaintiff's evidence.

{213} Evidence shows that the defendants engaged in improper conduct intended to gain unfair advantage over BPS. After Farrington and other BPS employees left for H&E, BPS discovered confidential information missing from the branch. Farrington maintained a binder of preferential pricing in his office. Following his departure, that binder could not be located. Matthews produced in discovery customer contact information that he took with him from BPS—despite being told by Christensen not to take any BPS documents with him. Matthews left binders containing only blank pieces of paper when he was required to leave information concerning customer contacts and new job starts. Customer profiles maintained by Gloria Silva could not be located at BPS within a week after she left BPS for H&E. In addition, Matthews' cell phone, paid for by BPS, was programmed to forward incoming calls to him when employed at H&E. The cell phone could not be disabled because the phone had been locked out and the access code was unknown.

{214} Mathews resigned from BPS without giving any notice on March 20 and joined a sales meeting with Farrington at H&E that day. Matthews also that day called on BPS customers, including Drywall Interiors, and admitted that he had no pricing information from H&E. Christensen called on Mills Electric and Haley Greer after the H&E branch opened, and Matthews immediately sought after other BPS customers, such as Oak Cliff Glass.

{215} Following the departures of Farrington and the other BPS employees to H&E in March 2000, longtime customers of BPS, including Potter Concrete, Ram Steel, Mills Electric, Cherry Paint, Gorman & Associates, Williams Insulation, and Oak Cliff Glass, stopped doing business with BPS and instead placed their AWP rental orders with H&E. The speed at which H&E switched long time customers of BPS to H&E is shown by the decline in contracts with Oak Cliff Mirror & Glass, Potter Concrete and Williams Insulation in March and April 2000 and the concurrent rise in contracts with those customers at H&E. The evidence shows that BPS had "gentleman's agreements" with these customers and reasonable expectations of continuing to do business with these customers prior to defendants' solicitation of the BPS employees to H&E and related conduct. Indeed many of the BPS customers that were lost to H&E were customers with whom Linda Gomez, not Mathews or Moon, had established relationships belying the suggestions that customers simply followed the sales representatives to H&E.

{216} The rapid departures of Farrington, Billups and the other BPS employees to H&E's Hi-Lift branch in Dallas had a debilitating effect on the BPS branch in Dallas, including the loss of longstanding customers. With the departure of Farrington, Matthews and Moon, the outside AWP sales presence was reduced to one experienced and trained AWP salesperson, Ms. Gomez. Mr. Lane, an outside AWP salesman, had to assume duties as the new branch manager. Besides Gomez, the only other AWP outside salesman was Scott Douglas, an apprentice with little experience. Equipment was not serviced and delivered in a timely manner, leading to customer dissatisfaction. As a result of the defendants' conduct, some longtime customers of the BPS Dallas branch stopped placing orders with BPS/Sunbelt.

{217} While BPS business was suffering, the Dallas Hi-Lift branch grew rapidly. It was profitable in 2000. Christensen and Farrington received bonuses for their performance in 2000 because the company exceeded the plan for 2000.

{218}   There is evidence that the same pattern of conduct found at other branches existed at the Dallas branch. The Court finds the following:

(a)   Telephone records indicate that Hepler and Christensen called the BPS Dallas branch after Christensen tendered his resignation, but prior to his leaving BPS, at a time when Farrington was employed at BPS.  Farrington did not deny that he spoke with Christensen on the telephone at the BPS branch at the time in question.

(b)   Christensen met with Farrington on at least two occasions before Farrington left BPS.  On the first such known occasion, they discussed when Farrington would need to leave BPS, which suggests that the preliminary discussions had long passed.

(c)   Christensen used BPS as his primary personnel source for the Hi-Lift Dallas branch.

(d)   Christensen testified that risk and uncertainty exist with starting a new company and that he considered that uncertainty in deciding to accept employment with H&E.  One of those risks was establishing itself by reputation, "the new-guy-on-the-block syndrome."  Christensen admitted that he brought employees from BPS to make the company profitable and that that gave him greater comfort with his decision to go to H&E.

(e)   Farrington testified that he reviewed the property then used by Martin Equipment, another division of H&E, to determine whether it could be used for the Hi-Lift operations, and that his assessment was that it would not work.  He further testified that afterward he met with Delores Kline to identify another location for the branch, which turned out to be the branch that Hi-Lift operates out of in Dallas.   Farrington testified that none of this occurred while he was employed by BPS. Farrington's last day with BPS was either March 14 or 17, 2000.  If Farrington were correct, then work on identifying this new property would had to have occurred after March 14.  H&E, however, signed a letter of intent with respect to the lease of this property on <u>February 11, 2000.</u>

{219}   Farrington testified that prior to resigning on March 4, he did not know that Christensen was meeting with other BPS employees, and he denied having any role in the recruitment of BPS employees while he was himself employed by BPS.  Indeed, Farrington admitted that it would have been improper for him to solicit employees while employed by BPS. Yet, an H&E expense record filled out by Christensen shows that Farrington met with Christensen and Billups *together* on March 3, 2000 (while Farrington was the branch manager of BPS).  When confronted with this document, Farrington admitted that maybe he was "in the same building" with Billups but that he had nothing to do with his recruitment.  Reluctantly, Farrington admitted that he was aware that Christensen was discussing Billups going to H&E. Christensen testified that he met with both Farrington and Billups together and it was at this lunch that they discussed when Farrington would leave BPS for H&E.

### Houston and San Antonio

{220}   **Houston**.  As with Dallas, Christensen was intimately involved in the solicitation of employees for the new H&E Hi-Lift branch in Houston, Texas.

{221}   H&E had a small fleet in Texas at its South Texas Equipment subsidiary.  South Texas was better known

as a crane and earth moving equipment company than a AWP rental company. Prior to 2000, the South Texas fleet consisted largely of aging Grove equipment. Utilization of the Grove fleet did not meet Engquist's expectations. Because of its Grove fleet, the South Texas AWP mechanics had not attended special training by Genie or JLG prior to January 2000. Christensen testified that when he first met with John Engquist he was told that H&E had not been very successful in the rental market and that is why they were looking to bring on Hepler, Kline, Quinn and himself: to develop a new H&E rental division.

{222} The Houston branch manager, Rodriguez, testified that Engquist did not speak to him prior to November 1, 1999 about expanding the operations in Houston or opening up in other markets. Rodriguez's testimony confirms that the creation of the H&E Hi-Lift division was only explored after Hepler and Kline approached Bruckmann, Bagley and Engquist.

{223} In February and March 2000, Christensen met with BPS employees in Houston for the purpose of soliciting them to H&E. Christensen, later with the assistance of Rodriguez, solicited and hired eight experienced BPS employees to the Houston branch, nearly one-third of the H&E work force in Houston. The former BPS employees were hired for similar positions at H&E and, with one exception, were given pay increases to go to H&E. No headhunters nor advertisements in newspapers were used for building the new Hi-Lift branch.

{224} H&E expanded its customer base rapidly in 2000 concurrent with its hiring of employees from BPS. Significantly, no contracts were produced by H&E for many customers at the branch until the period after April 2000. H&E's business with Brown & Root nearly tripled between January and April 2000. By October 2000, after hiring eight employees from BPS, H&E doubled its rental revenue in Houston from the same time the prior year.

{225} **San Antonio.** Hepler, with Christensen's assistance and input, solicited David Hobbs, BPS's branch manager in Charleston, South Carolina for a new Hi-Lift branch in Texas. Hobbs received a substantial pay increase—$20,000, plus a $27,000 moving expense payment—to leave BPS for H&E. The day after Christensen left BPS, he traveled to Jacksonville to meet with Hepler and Rodriguez and then traveled to Savannah, Georgia to meet with Hobbs and Alexander. Hepler had given Christensen responsibility for soliciting Hobbs. Following the meeting with Hobbs in Savannah, Hepler and Christensen continued their conversations with Hobbs to solicit him to H&E, and Christensen kept Hepler abreast of his progress. Hobbs was on board quickly though, and signed H&E employment forms in late January 2000 indicating his acceptance of employment at that time. Then Christensen, with Hobbs' assistance, solicited Gloria Silva (Ysassi) from BPS to H&E.

{226} The recruitment of Hobbs is a good example of the difficult interplay of fair and unfair competition. If nothing else had happened, the hiring of David Hobbs to leave BPS in Charleston and move to a new Hi-Lift branch in San Antonio would not be a problem. The same could be said of the hiring of Gloria Silva (Ysassi) to be credit manager in San Antonio. Standing alone, each hire would not provide grounds for an unfair trade practices claim. When put in the context of the overall raid of BPS employees, the two hires provide additional evidence of a deliberate effort to orchestrate mass defections from BPS to H&E and to appropriate

the intellectual knowledge base of Sunbelt.

{227}   While having some minor impact, the defendants' actions in the Houston-San Antonio market were not as devastating as the actions taken in the other BPS branch markets targeted by H&E.  They are evidence, however, of the pervasive effort of H&E to siphon off most of the key employees of BPS.

**Atlanta**

{228}   The Atlanta Hi-Lift branch opened on or about March 15, 2000.  The following BPS personnel were either on-board at the opening or working with Hi-Lift within two weeks of opening:  a branch manager (Mark Alexander); a full AWP outside sales staff   (David Leavell, Bill Kenyon, Dan Franz and James Cornett); a service manager (James Brown); a shop foreman (Dan McMahan); mechanics (Paul Fredrickson, Michael Mullen and Roger Dempsey); a credit manager (Andrew Warshaw); a parts coordinator (Clinton McMahan); and drivers (Nathaniel West and David Waddell).  Shortly thereafter, the Atlanta Hi-Lift branch added an administrative assistant (Rhonda Rathel).  Each of these employees was hired from BPS.

{229}   Hepler and Quinn arranged to meet with Alexander, the nine-year existing manager of the BPS Atlanta branch, on January 6, 2000 to begin the plan leading to the opening of the H&E Atlanta branch.  At lunch, Hepler told Alexander he wanted to open an H&E branch in Atlanta and wanted assurance that Alexander would consider becoming the branch manager.  Alexander was given responsibility for hiring employees at the new H&E branch.

{230}   A dinner was arranged that night with four long-term BPS employees that worked under Alexander at the Atlanta branch:  Atlanta's two most successful salesmen, David Leavell ("Leavell") and Jim Cornett ("Cornett"), the Atlanta service manager James Brown ("Brown") and Alexander's "right-hand man at the branch," Dan Franz ("Franz"), the scaffolding manager.  Hepler and Alexander claim that the dinner was Alexander's idea to get old friends together and deny that recruitment was.   This testimony sharply conflicts with co-defendant Quinn's testimony that Hepler set this dinner up to recruit these BPS employees for H&E.  Once again, Hepler's credibility is at issue, and for the multiple contradictions between Hepler and other sworn testimony, the Court again finds Hepler is not credible.

{231}   Quinn testified that the dinner was arranged for the express purpose of recruiting BPS employees to come work for H&E.  Hepler's only explanation when confronted at trial with Quinn's testimony was that Quinn's recollection was inaccurate.  Alexander admits that he falsified his expense report for this Atlanta dinner (to hide the fact that Hepler and Quinn attended) and submitted it to BPS for payment.  The fact that similar meetings were held with the key employees in other branches with the branch managers present indicates a pattern of using the branch managers to solicit, plan and organize the defections.

{232}   H&E business records show that employee benefits information was requested for Mark Alexander on January 7, 2000, and that insurance networks were already in place for the Atlanta employees.

{233}  Hepler subsequently arranged a meeting with Alexander in Savannah on January 20, 2000, at which time Hepler showed Alexander a detailed business plan for the Hi-Lift division that contained projections for all branches.  Regarding the plan he reviewed with Hepler on January 20, Alexander testified:   "[Hepler] and Doug [Kline] had put together a one-year—I believe a one-year, three-year, five-year growth plan and that

the return on investment was very, very achievable. I asked to look at it. He showed it to me, pulled it out of his briefcase, and the numbers I saw were achievable in my opinion." Hepler denies showing Alexander a business plan that night and, when confronted at trial with Alexander's testimony, claimed that Alexander's recollection was inaccurate. Defendants did not call Alexander as a witness.

{234} Hepler assured Alexander on January 20 that the necessary capital was available for the H&E start-up. With respect to capital, Hepler explained to Alexander "that it was all arranged, that not all of it was one hundred percent secured yet and some of that was contingent upon the fact the we come out—*that Hi-Lift come out of the box pretty strong*. But that he was confident that that wasn't going to be a problem." (Emphasis added.) That evidence confirms at least the need for swift conversion of the necessary BPS employee base.

{235} At the Savannah meeting, Hepler offered Alexander a job as the Atlanta branch manager, which Alexander accepted at that time. Alexander's salary would increase from $103,500 at BPS to $105,000 at H&E, and he also received a $25,000 signing bonus. Alexander assured Hepler that he could hire the necessary people for the branch. When asked at deposition who he had in mind that night to recruit, Alexander immediately responded with eleven names, all of whom he hired from BPS for the Atlanta startup.

{236} The next day, January 21, 2000, Alexander resigned from BPS and immediately spoke with Brown about his resignation. Alexander used Brown as an inside source to set up meetings and solicit BPS employees. Brown expressed to at least one BPS employee (Galvond) his intent to harm BPS by gutting the BPS branch to the ground. Brown not only solicited BPS employees on behalf of H&E he also, while still employed by BPS, encouraged at least one BPS employee to take confidential BPS files and information home with him in anticipation of leaving BPS to work for H&E. Brown also indicated to Galvond that his reason for taking his BPS laptop computer home with him each night was for the purpose of compiling confidential BPS information for use at H&E.

{237} Alexander arranged a lunch with Brown on February 8, 2000, prior to Brown's resignation from BPS. At this lunch Brown showed Alexander a list of BPS employees Brown wanted to recruit from BPS to work for H&E. Brown told Alexander at this lunch that the instability at BPS caused by Alexander's resignation would help his efforts to recruit BPS employees for H&E. Alexander testified in deposition that it would be improper for Brown to recruit BPS employees for H&E while still employed at BPS.

{238} While still employed by BPS, Alexander spent time with Doug and Delores Kline trying to locate a facility for H&E to open its Atlanta branch. A factor Alexander considered in locating a facility for H&E was to find a location that would make it easier to recruit BPS employees.

{239} When Brown began his employment with H&E, he told Alexander that he had already been in contact with several BPS employees he was recruiting for H&E and undertook the role of overseeing recruitment of employees for H&E. Alexander gave him authority to make employment offers on behalf of H&E.

{240} Between late February and early April 2000, at least 13 more BPS employees solicited by Alexander and

Brown left BPS and began work with H&E. On opening day, every employee of H&E's Atlanta branch had been hired from BPS.

{241} The H&E branch in Atlanta was virtually identical to the former BPS Atlanta branch with respect to its employees, customer base and structure. In addition to all employees being former BPS employees, employees' responsibilities at H&E were virtually the same as at BPS. Former salesmen were assigned the same territories at H&E that they had at BPS, called on BPS customers and based pricing on information and experience acquired at BPS. In effect, H&E's Atlanta branch operated as the former BPS branch—used the same employees to conduct the same business with the same customers.

{242} Only ninety days after Hepler and Kline departed from BPS, on or about March 23, 2000, H&E opened a greenfield branch in Atlanta, where it previously had no operations, with all the necessary employees to sell, service and deliver equipment.

{243} In building a fleet for H&E's Atlanta branch, Quinn placed orders based on information and knowledge acquired at BPS concerning the Atlanta market instead of conducting market studies and evaluations, a process that Hepler testified is necessary for any greenfield operation.

{244} Cornett testified in deposition that he covers the same territory for H&E that he covered for BPS and is still using his BPS customer list at H&E. Cornett admitted that he likely called on BPS's biggest customers first, with no pricing information or marketing materials from H&E. Alexander admitted that he did not establish rental rates for H&E's Atlanta branch until July 2000, four months after the branch opened. Prior to that point, salesmen priced equipment based on past experience, with no guidance from H&E. When Leavell began his employment with H&E, there were no meetings in which the sales staff discussed rental rates, sales strategy or marketing strategy—Alexander simply instructed the salesmen to go do their jobs. Leavell took with him to H&E, however, notes that he had taken at BPS regarding BPS customers, including contacts.

{245} Further evidence that H&E's Atlanta branch as well as other AWP branches operated as the former BPS branch is a June 12, 2000 H&E memo from Mark Alexander to "All branch managers," copied to Defendants Kline, Quinn and Christensen, in which Alexander, stated:

> Last Tuesday I had a meeting with Jeff Farmer with MLS & Assoc. I know the entire former BPS crowd remembers that MLS was our printing supplier for many years. . . . The good news for us is that . . . [MLS] has all of the marketing brochures we ever produced and none of this is copyrighted or trademarked. . . . Jeff and I have another meeting tomorrow at which time he is going to bring the first draft of the monthly order form we were receiving every month from MLS. By the end of the week you should be receiving this form by fax at your branch.

{246} The loss of its branch manager and key personnel to H&E in such a short period of time caused turmoil in the BPS Atlanta branch. BPS was forced to bring in personnel from other branches in order to deal with the situation; they were unable to respond to customer needs and requests in a timely fashion; the condition of equipment in the yard suffered; and customers began calling BPS equipment off rent at a high rate. As a result, BPS lost a significant amount of business, and the volume of equipment being rented slowed

considerably because BPS lacked qualified people to rent it, lacked qualified people to repair it, and lacked qualified people to deliver it.

{247} Despite being a greenfield operation in a market in which H&E previously had no presence, the H&E start-up branch in Atlanta did not struggle but was profitable by July 2000, exceeding the budgets that had been set for it by year-end. Reflecting the existence of and execution of the Plan, while Sunbelt's revenue at the Atlanta branch from the BPS customers was dropping dramatically (often to zero), H&E's revenue from these same customers rose from zero to hundreds of thousands of dollars.

## H&E Today

{248} As the result of the employment activity by Defendants Hi-Lift, Hepler, Kline, Quinn and Christensen, Hi-Lift is substantially different today than H&E's aerial work platform division was as of December 31, 1999. Not only was the H&E AWP fleet aging, it had not been very productive for H&E. As of December 31, 1999, H&E's AWP fleet had only generated rental revenue of $7.2 million, a gross profit of only $2.5 million and a pre-tax loss of $289,000. The results of H&E's employment of Hepler, Kline, Christensen and Quinn and their conspiratorial activities, were that Hi-Lift realized $23.4 million dollars in rentals by December 31, 2000, a gross profit of $16.9 million and a pre-tax profit of $3.4 million. This profit occurred notwithstanding that two of the branches in the Hi-Lift division did not open until the middle of March 2000, followed by two more in May and one in June. Thus, through the opening of branches where Hi-Lift had no prior presence and the employment of BPS personnel at those branches and the "struggling" branches which H&E operated in Texas, Hi-Lift achieved over three times the rental revenues it previously had and turned a loss into a substantial profit. The turnaround totaled $3.7 million in one year.

{249} Even more remarkable is the speed at which Hi-Lift achieved profit before taxes (and before corporate allocations) and exceeded budget/projections. By July 14, 2000, Defendant Kline reported that Hi-Lift had $153,000 profit before taxes in June (before corporate allocations) and had exceeded the budget/projection for the time-frame. Further, Kline reported that Charlotte utilization, which was at 58 percent, was not alarming because of Hi-Lift's expectation that the "Corning job would utilize most of the remaining equipment very shortly."

{250} Similarly, a month later, Kline further reported that the Hi-Lift division had achieved $613,000 in profit before taxes (and before corporate allocations) and that "all branches were profitable in July." As significantly, as Kline had reported in June, utilization by branch and across the entire fleet was extraordinarily high. By July 26, the Charlotte fleet, six weeks after opening, was at a 74 percent utilization level and quickly moved to 80 percent. Hi-Lift had 2,746 units in the fleet as of August 9th and a 79 percent utilization for the entire fleet.

{251} Hi-Lift rentals increased by $30.8 million, or 130 percent, to $55.4 million in fiscal year 2001 over fiscal year 2000. Thus, in fiscal year 2001, Hi-Lift had almost eight times the revenue it had as of December 31, 1999. As stated by an industry expert, such results are "astounding." Moreover, the Court finds that these results confirm a number of points including:

(a) The mass departures severely injured Sunbelt, a result that could only have been intended by defendants or the product of callous disregard for the consequences.

(b) Sunbelt/BPS confidential business information was used by defendants; otherwise, their personnel could not have been assembled so much business so quickly and efficiently.

(c)     Sunbelt's expected repeat business was quickly and effectively appropriated by defendants.

(d)     Defendants' activities were unfair, unethical and anticompetitive.

(e)     The actions resulted in a dramatic $3.7 million turnaround in performance in one year.

## II.

## CONCLUSIONS OF LAW

{252}   Truth matters.

{253}   To the extent there may have developed in the business community a sense that in business litigation it is acceptable to render less than truthful testimony, that trend is one which must be reversed. The primary business of the courts is ascertaining the truth. Those who impede that work by providing less than complete, honest testimony should not be surprised to find their conduct unrewarded by the legal system. Every witness who takes an oath is compelled to tell the truth, the whole truth and nothing but the truth. Those who fail to honor that oath leave all their credibility on the courthouse steps. A healthy economic system requires a strong legal system that permits, promotes and protects fair competition while prohibiting and punishing conduct that threatens the vitality of that competitive system. Finding the truth is an essential part of the work of our legal system. Every witness is compelled to cooperate fully and truthfully in that search.

{254}   The Court, as Finder of Fact, had the opportunity to judge the testimony of the live witnesses firsthand. That is significant in this case where the testimony of defendants and the inferences to be drawn from their actions are in conflict. Defendants chose not to present live testimony from Defendants Kline, Christensen, Quinn and Pearsall, nor did branch managers Jones, Drennan and Alexander appear live. The Court has reviewed their proffered deposition testimony. The Court finds credibility issues as to defendants' witnesses with respect to two key subject areas: the existence of a plan to raid BPS at its key branches in an orchestrated manner and the use of the branch managers to do so. In both subject areas, the uncontroverted actions speak louder than words of denial. On numerous occasions, Mr. Hepler's testimony was contradicted by his own employees, his own documents or the credible testimony of others.

{255}   Sunbelt has the burden on each of its claims of proving by "the greater weight of the evidence" that defendants' actions caused the damages that Sunbelt claims were the result of the massive departure of its employees and consequent conversion of customers and trade secrets. Sunbelt need not have a particular quantity of evidence in order to prove its claims; it must simply show that, considering all of the evidence, the facts necessary to find in its favor are more likely than not to exist. *See, e.g., Joyner v. Garrett*, 279 N.C. 226, 236, 182 S.E.2d 553, 560 (1971) (holding that the law relating to burden of proof is equally applicable to jury and non-jury trials).

{256}   As a general matter, the Court notes that the failure of four defendants, and a number of H&E employees who figure prominently in defendants' plan and conspiracy, to testify at trial in a civil matter is a "pregnant circumstance" for the Court to consider. *Jacobs v. Locklear*, 65 N.C. App. 147, 150, 308 S.E.2d 748, 750 (1983); s*ee also Ledford v. Emerson*, 141 N.C. 596, 54 S.E. 433 (1906) (finding that failure of defendant to

testify was legitimate subject of comment before the jury); *Allred v. Demuth*, 890 S.W.2d 578, 581 (Ark. 1994) (holding that failure to testify gives rise to presumption that the testimony would have been against the party's interest); *Keith v. Burlington Northern Railroad Co.*, 889 S.W.2d 911, 918 (Mo. Ct. App. 1995) (permitting an unfavorable inference against party who fails to testify).

{257}   In this case, considering the totality of the evidence, the Court may and does draw an adverse inference from the fact that Defendants Kline, Christensen, Quinn, Pearsall (who sat through several days of testimony in this Court), and other prominent H&E employees failed to testify at trial. However, that adverse inference was but one factor considered by the Court in reaching its decision, which would have been the same without the inference.

{258}   Because the law makes no distinction between the weight to be given to either direct or circumstantial evidence, and no greater degree of certainty is required of circumstantial rather than direct evidence, the Court has also afforded equal weight to direct and circumstantial evidence presented at trial and through depositions and exhibits. *See, e.g.*, N.C.P.I.– Civil 101; *Patton v. Dail,* 252 N.C. 425, 428, 114 S.E.2d 87, 90 (1960) (holding that a fact in controversy may be established by circumstantial evidence); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 377, 542 S.E.2d 689, 693 (2001) (finding that circumstantial evidence was sufficient to support finding of trade secret misappropriation).

{259}   Additionally, certain behaviors which may be benign or innocuous when standing alone, but which acquire a different meaning when placed in a larger context, may allow the Court, in light of the totality of the facts and circumstances, to reasonably infer that illegal conduct occurred in this case. *See Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 568 F.Supp. 205, 210 (E.D.N.C. 1983).

{260}   In summary, the Court finds that the tortious interference claims are subsumed in the U.D.T.P.A. claim, and that defendants (1) violated N.C.G.S. § 75-1.1,  (2) misappropriated trade secrets, and (3) committed civil conspiracy. Damages for tortious interference, misappropriation, and civil conspiracy are subsumed under the U.D.T.P.A. damages. Plaintiff has been damaged by defendants' unfair and deceptive behavior in the amount of five million dollars; these damages are to be trebled under N.C.G.S. § 75-16.1.

**U.D.T.P.A.**

{261}   To establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to plaintiffs. *E.g., Dalton v. Camp,* 353 N.C. 647, 656**,** 548 S.E.2d 704, 711 (2001); *Becker v. Graber Builders, Inc.*, 149, N.C. App. 787, 794, 561 S.E.2d 905, 910 (2002). Plaintiff has fulfilled each of those requirements.

{262}   Whether an act is unfair or deceptive is a question of law for the Court to determine. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

{263}   Although certain acts, standing alone, may evoke the action, a claim for unfair and deceptive trade practices pursuant to N.C.G.S.§ 75-1.1 is an independent claim that stands alone as a distinct action and is not derivative. *See, e.g., Bhatti v. Buckland*, 328 N.C. 240, 400 S.E.2d 440 (1991) (finding that proof of

fraud alone would establish that unfair and deceptive trade practices have occurred, no finding of "substantial aggravating circumstances"); *The Country Club of Johnson County v. U.S. Fidelity & Guaranty Co.*, 150 N.C. App. 231, 563 S.E.2d 269 (2002) (noting that a claim under N.C.G.S. § 75-1.1 is independent of other claims and affirming judgment on claim of unfair and deceptive trade practices alone); *Drouillard v. Keister Williams Newspaper Services, Inc.*, 108 N.C. App. 169, 423 S.E. 2d 324 (1992) (holding that if a violation of the North Carolina Trade Secrets Protection Act satisfies the three prong test, then it would be a violation of N.C.G.S. § 75-1.1), *appeal dismissed and review denied*, 333 N.C. 344, 427 S.E.2d 617 (1993); *Bernard v. Central Carolina Truck Sales*, 68 N.C. App. 228, 230, 314 S.E.2d 582, 584 (1984) ("As previously stated, an action for unfair and deceptive acts or practices is a distinct action [and] . . . creates a cause of action broader than traditional common law actions. . . .").

{264}   Whether an act or practice is unfair is determined on a case-by-case basis, and "the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *United Laboratories v. Kuykendall*, 102 N.C. App. 484, 491, 403 S.E.2d 104, 109 (citations omitted), *aff'g,* 335 N.C. 183, 437 S.E.2d 374 (1993); *see Johnson v. Phoenix Mut. Insurance*, 300 N.C. 247, 262-63, 266 S.E.2d 610, 621 (1980) (finding that whether a trade practice is unfair or deceptive depends on the facts of each case.).

{265}   A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Johnson v. Phoenix Mut. Ins.,* 300 N.C. 247, 266 S.E.2d 610. The U.D.T.P.A. is "directed toward maintaining ethical standards in dealings between persons engaged in business, and [intended] to promote good faith at all levels of commerce. Unfair methods of competition [ . . . ] would not promote good faith . . . ." *Kuykendall*, 102 N.C. App. at 491, 403 S.E.2d at 109 (citations omitted).

{266}   One method of determining if actions are unfair or unethical is to look at those actions through the lens of equity. Faced with an *ex ante* rather than *ex post* review of the actions, what would a court of equity do faced with a request for injunction? Would a court enjoin defendants from using a competitor's branch managers to secretly hire away the competitor's employees and orchestrate their departure in a manner designed to impair the competitor and benefit the defendants? *See, e.g., Global Telesystems, Inc.,* v. *KPNQwest,* 151 F. Supp. 2d 478 (2001) (S.D.N.Y.); *Thal v. Polumbaum,* 196 Misc. 897, 900, 96 N.Y.S.2d 226, 230 (1949); *The Monitor Stove Co. v. The Williamson Heater Co.,* 18 Ohio App. 352 (1923). Surely a court would not *ex ante* condone such behavior. If so, it should find the same behavior *ex post* to be unfair and unethical.

{267}   BPS/Sunbelt and Hi-Lift were in competition in the AWP rental business, and the conduct which the Court has found to violate the U.D.T.P.A. was in and affected commerce as required by the statute.

{268}   The surreptitious and intentional use of BPS employees to solicit other key employees while both the soliciting and solicited employees were still employed by BPS is an unfair trade practice. Defendants' attempts to conceal their mendacious behavior have failed. Their lack of credibility on this issue is a factor for the Court to consider in determining whether their actions constituted unfair trade practices. It is

precisely the conduct which the Court has found to be unfair that was the subject of defendants' untruthful testimony. Defendants' lack of candor with respect to the solicitation of other employees by Hepler and the branch managers while the branch managers were still employed by BPS demonstrates their belief that such conduct was legally and ethically unacceptable. Indeed, Mr. Engquist and others so testified.

{269}   Defendants admit that they gave no consideration to the impact of their actions on the BPS branches at issue. In addition, defendants have admitted that they were in a position to understand the dire consequences of their actions on the raided branches. John Engquist admitted that the behavior of a branch manager in soliciting employees who reported to him and telling them to leave immediately would be improper behavior. Rob Hepler likewise admitted that such conduct was unethical.       Undermining the entire structure of a branch by secretly soliciting key employees at various levels of the organization to leave *en masse* to H&E with the inevitable consequence of crippling the branch, and then using the same employees to blitz BPS customers for business with H&E is not ethical competitive behavior. Building fully functional and profitable greenfield branches in a matter of days, rather than months, through orchestrated, *en masse*, secret recruitment efforts by key insiders is not ethical behavior in competition.

{270}   Competitor A may not use existing management employees of Competitor B to secretly solicit *en masse* defections to Competitor A's business while those managers or key employees are still employed by Competitor B, particularly where Competitor A knows that the coordinated *en masse* defections will impair Competitor B's ability to function and provide at least a temporary competitive advantage to Competitor A in the marketplace. Competitor A could openly solicit any employee of Competitor B who was not bound by a contract containing a restrictive covenant so long as the new employee does not use confidential business information and trade secrets of Competitor B. The employee could be offered more money. There would be no limit on the number hired. Here it is the surreptitious recruitment of *en masse* defections timed to disrupt Competitor B's business and take advantage of the employees' knowledge of confidential business information which crosses over the line of fair competition.

{271}   The Court also considered the deliberate acts of disruption committed by the departing employees as well as the derogatory comments made by the branch managers and other key employees. Further, the manipulation of the employee departures in the form of mass resignations was also unfair and calculated to handicap BPS in such a way that Hi-Lift could take competitive advantage of the situation it had unfairly created. It eliminated the opportunity for BPS to compete for the employees on a level playing field.

{272}    The Court is not holding that Hi-Lift could not hire BPS employees, be they executives, branch managers, salesmen or mechanics. Had Hi-Lift opened a branch office prepared for business and then advertised for employees, any BPS employee could have been solicited and hired. Prior to opening a branch office, Hi-Lift could have advertised in trade publications that it was seeking experienced employees. Any BPS employee could have chosen to respond to that advertisement. Indeed, many BPS employees may have applied for employment with Hi-Lift. In its haste and its effort to take advantage of BPS before Sunbelt could close its purchase, Hi-Lift overstepped the bounds of ethical and fair competition.

{273}   An example of activity by Hi-Lift that would not fall into the category of unfair trade practice was the

hiring of David Chapman. He ran the Charleston branch for BPS and was a friend of Hepler. He was hired away from BPS to run the Houston branch for Hi-Lift. He did not hire any Charleston employees and was contractually free to work wherever he desired. Hi-Lift did not commit any unfair trade practice by hiring him, and his hiring had no adverse impact on the Charleston branch other than the loss of his personal experience. Hi-Lift did not have a competing branch in Charleston.

{274} The appellate court decisions dealing with unfair competition and conversion of business and employees demonstrate an awareness that competition is healthy and not to be unduly discouraged. Those decisions also evidence a desire to permit employees the greatest freedom of movement in order to maximize their job opportunities. *See, e.g., Dalton,* 353 N.C. 647, 548 S.E.2d 704; *Hiatt v. Burlington Industries, Inc.*, 55 N.C. App. 523, 529, 286 S.E.2d 566, 569, *disc. rev. denied,* 305 N.C. 395, 290 S.E.2d 365 (1982); *Long v. Vertical Technologies, Inc.,* 115 N.C. App. 598, 439 S.E.2d 797 (1994); *Fletcher, Barnhardt & White, Inc. v. Matthews*, 100 N.C. App. 436, 397 S.E.2d 81(1990), *disc. rev. denied,* 328 N.C. 89, 402 S.E.2d 411(1991). Nothing in this opinion should be read to depart from the trends evident in those decisions. Hepler and Kline were free to compete fairly, and each employee of BPS/Sunbelt was free to work for the employer he or she selected. The surreptitious way in which the BPS employees were solicited may have actually deprived them of the opportunity to see what Sunbelt would offer them to stay. None of the converted employees had the right to use BPS/Sunbelt confidential business information, but they could use the experience and contacts they had gained from years in the AWP business.

{275} The manner in which the branch managers were used was deceptive. That deception prevented fair competition for both employees and customers. The deceptive, secretive nature of defendants' actions differentiates this case from others where courts have found the hiring of competitor's employees to be acceptable.

{276} In *Peoples Sec. Ins. Co. v. Hooks,* our Supreme Court affirmed the 12(b)(6) dismissal of plaintiff employer's claim that its former employee had unlawfully interfered with the employment contracts of other employees. 322 N.C. 216, 367 S.E.2d 647 (1988). After quitting, defendant employee hired away many of his co-workers and subsequently assigned them to develop the same territory as they had worked with the plaintiff. Our Supreme Court looked to other jurisdictions for the proposition that "[t]he free enterprise system demands that competing employers be allowed to vie for the services of the "best and brightest" employees without fear of subsequent litigation for tortious interference." *Id.* at 222, 367 S.E.2d at 651 (citing *McCluer v. Super Maid Cook-Ware Corp.*, 62 F. 2d 426 (10th Cir. 1932); *Vincent Horwitz Co. v. Cooper*, 352 Pa. 7, 41 A. 2d 870 (1945); *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 67 Cal. Rptr. 19 (1968); *Coleman & Morris v. Pisciotta*, 107 N.Y.S. 2d 715, 279 A.D. 656 (1951)).

{277} The clearest differences between the *Hooks* case and the case before this Court are the timing, subterfuge, and wrongful purpose. In *United Lab. v. Kuykendall*, the North Carolina Supreme Court clarified its ruling in *Hooks.*

> [I]n a recent decision, [this Court] held that in some situations a competitor may hire an employer's former employees without being liable for tortious interference with contract. In *Hooks*, plaintiff's employees had terminable at will contracts with

plaintiff, had signed covenants not to compete, and subsequently went to work for one of plaintiff's competitors. This Court held that hiring the competitor's former employees and assigning them to the same territory they had worked in their prior employment was not a tortious interference with contract. We held in *Hooks* that a claim for tortious interference with contract would not lie where a defendant had only "offered the plaintiff's employees job opportunities which induced them to terminate their terminable at will contracts and, by locating these employees in their previously assigned territories, induced them to breach the non-competition clauses contained in their contracts with the plaintiff." We concluded that the fact that the plaintiff and defendant were in competition was sufficient to justify the defendant "in offering the plaintiff's employees new jobs and locating them in their previously assigned territory." In *Hooks*, however, we also emphasized that "'[t]he privilege [to interfere] is conditional or qualified; that is it is lost if exercised for a wrong purpose. In general a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interests of the defendant which is involved.'"

322 N.C. at 662, 370 S.E.2d at 387 (internal citations omitted).

{278}    Defendants would like to avail themselves of the notion that competition justifies their actions. *See Childress v. Abeles*, 240 N.C. 667, 84 S.E. 2d 176 (1954). However, defendants should have used lawful means to pursue their ends. *See, e.g., id.*; *Hooks*, 322 N.C. 643, 370 S.E.2d 375.

{279}    Based on the above findings of fact, and pursuant to North Carolina law, there is extensive evidence showing that the actions of defendants were unfair, unethical, and immoral; those actions proximately caused Sunbelt's injury; those actions were of and affecting commerce; and, thus, the Court finds that these actions constitute unfair trade practices or unfair methods of competition under N.C.G.S. § 75-1.1.

### Tortious Interference

{280}    The Court will not deal with the tortious interference claims separately, as each is subsumed in the holding of unfair competition. If an appellate court were to find that defendants' conduct was not barred as unfair competition, it would be difficult to find that it was "tortious interference" since there would have been a determination that the competitive actions were fair and protected.

### Trade Secrets

{281}    The application of the law of misappropriation of trade secrets is difficult to apply in this case because of the nature of the industry, the vast experience of the BPS/Sunbelt employees hired away by Hi-Lift and the difficulty of proving specific use of the information. Here, the use of confidential business information by Hi-Lift would have been coextensive with the unfair competition that the Court has found to exist by virtue of the unlawful *en masse* appropriation of the employee base. The damages for misappropriation would be included in the unfair trade practice damages for all practical purposes. *See Drouillard,* 108 N.C. App. 169, 423 S.E.2d 324.

{282}    Under the North Carolina Trade Secrets Protection Act ("Trade Secrets Act"),

"Trade secret" means business or technical information, including but not limited to a formula, pattern, program, devise, compilation of information, method, technique, or process that:

1.    Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development

> or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152 (2001).

{283}   The factors which trial courts should apply in determining whether information is properly classified as a trade secret have been clearly enunciated by the appellate courts. The six primary factors are: (1) the extent to which the information is known outside the business, (2) the extent to which it is known inside the business, (3) the measures taken to guard the secrecy of the information, (4) the value of the information to the business and to the competitor, (5) the expenditure of time and money in developing the information and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others. *See Byrd's*, 142 N.C. App. at 375, 542 S.E.2d at 692; *State ex rel. Utilities Comm'n v. MCI Telecommunications Corp.,* 132 N.C. App. 625, 634, 514 S.E.2d 276, 283 (1999); *Wilmington Star News, Inc. v. New Hanover Regional Medical Center,* 125 N.C. App. 174, 182, 480 S.E.2d 53, 57, *appeal dismissed,* 346 N.C. 557, 488 S.E.2d 826 (1997).

{284}   Applying these factors in specific factual situations, our courts have found a variety of information to constitute a trade secret. *See Byrd's*, 142 N.C. App. at 371, 542 S.E.2d at 689 (cost history information); *Wilmington Star News Inc.*, 125 N.C. App. at 174, 480 S.E. 2d at 53 (price lists); *Barr-Mullin Inc. v. Browning*, 108 N.C. App. 590, 424 S.E. 2d 226 (1993) (computer software); *Drouillard*, 108 N.C. App. 169, 423 S.E.2d 324 (customer lists, pricing formulas and bidding formulas).

{285}   Under the Trade Secrets Act, "misappropriation" is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1).  Plaintiff bears the initial burden of showing a *prima facie* case of misappropriation by introducing substantial evidence that the defendant: "(1) knows or should have known of the trade secret; and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C.G.S.§ 66-155.  There is no specific requirement that plaintiff show that defendants have disclosed or used the trade secrets, only that they had a specific opportunity to acquire the trade secrets for use or disclosure.  Once plaintiff establishes a *prima facie* case, the burden shifts to defendants to show that the trade secret was acquired properly.

{286}   There is seldom direct evidence of the use of confidential business information.  There is evidence in this record that some documents containing confidential information were removed from branch offices.  Certainly, the defendants in this case had access to all of BPS's business information; they built the business.  In this instance it may be more important to look at what was not done and the business results.  There is no evidence of a unified pricing structure for Hi-Lift.  Many salespeople testified that they did not have prices when they began calling on customers.  There were no restrictions placed on the sales people concerning use of BPS information.  The sales people began calling on the same customers within days of

leaving BPS and in some cases went after business that was based on special pricing arrangements. Credit decisions had to be based upon knowledge obtained at BPS, as there is no evidence of the independent development of credit information for the customers called upon at the outset. Indeed, there is little evidence of the independent development of information by Hi-Lift that one would expect in a normal greenfield operation. As previously noted, there was an advantage to Hi-Lift to get the new Hi-Lift branches open in the BPS markets before Sunbelt could close its transaction. The rapidity with which the old BPS customers were identified, called upon and converted to Hi-Lift, despite the lack of business information and guidance from Hi-Lift management, provides strong circumstantial evidence that at least some of BPS confidential information was used to solicit customers.

{287}   The evidence shows that the individual defendants knew BPS/Sunbelt's trade secrets and had access to them, and each had the opportunity to acquire them for disclosure and use. Prior to appropriating BPS employees, *en masse*, H&E had no customers in North Carolina, Georgia, or Florida. Despite this fact, the "new" H&E operations made a significant profit in their first year of operation—based on their taking of BPS/Sunbelt employees, trade secrets and customers—and the BPS branches experienced a concurrent, substantial decrease in business. This occurrence alone is circumstantial evidence of the defendants' use and disclosure of BPS trade secret information. *See, e.g., Byrd's*, 142 N.C. App. at 377, 542 S.E.2d at 693 (finding that evidence defendant acquired several of plaintiff's customer contracts after opening a competing business was "sufficient circumstantial evidence to sustain a finding that defendant knew of the confidential information, had the opportunity to acquire it for his own use and did so.") Here, testimony supports that Defendant Pearsall misappropriated confidential customer information of BPS—testimony that Pearsall never rebutted. In addition, testimony of witnesses located in Tampa/Fort Myers, Dallas and Atlanta supports that confidential customer information was misappropriated by BPS employees who left and went to H&E. Indeed, in Tampa, identical confidential pricing was used by Ms. Quasnick after she went to H&E, and in Dallas, Steve Mathews took sales notes with him, even though he was purportedly instructed not to do so by Christensen.

{288}   Based on the above the Court finds that (1) BPS/Sunbelt's compilation of information, including its special pricing information, customer information (identity, contacts and requirements of its rental customers), personnel and salary information, organizational structure, financial projections and forecasts, utilization rates, fleet mix by market, capital and branch budget information, and cost information, when taken together constitutes trade secrets and (2) that the defendants misappropriated BPS/Sunbelt's trade secret information unlawfully.

**Civil Conspiracy**

{289}   A claim for civil conspiracy "requires the showing of an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way that results in damage to the claimant." *See, e.g., Dalton v. Camp*, 138 N.C. App. 201, 213, 531 S.E.2d 258, 266 (2000), *rev'd on other grounds*, 353 N.C. 647, 548 S.E.2d 704 (2001).

{290}   Sunbelt must also show an "overt act' committed by at least one conspirator in furtherance of the

conspiracy. *Id*. at 212, 531 S.E.2d at 267.

{291} Circumstantial evidence is sufficient, in many cases, to prove an action for conspiracy. *See, e.g., id*. at 214, 531 S.E.2d at 267.

{292} In this case, the evidence presented at trial shows more than a mere suspicion or conjecture of an overarching unlawful plan for *en masse* departures of BPS employees and customers, the use of trade secrets, and the consequent stifling of BPS/Sunbelt's ability to effectively compete with H&E in the early stages of H&E's entrance into the markets at issue. The considerable shift of BPS employees and customers to H&E within a very short time period, the almost "instant" H&E greenfield branches that sprung up, and the use of certain BPS confidential information constitutes significant circumstantial evidence that the "raid" of BPS was planned and agreed to long in advance of its actual implementation.

{293} Plaintiff has shown sufficient circumstantial and direct evidence of an overall plan by H&E and Hepler, Kline and the other individual defendants, to cripple or eliminate BPS/Sunbelt as a competitor in the AWP business in at least seven markets. Many of the actions against BPS by the individual defendants were taken while each was still employed there. The strikingly similar pattern of taking the human resources from the branches through a "pyramid" scheme and the "secret" meetings held with Sunbelt employees supports a finding that there was an agreement. These actions are unlawful and constitute a conspiracy in furtherance of the acts as described above.

{294} In light of the Court's findings of fact, and the laws of North Carolina with respect to civil conspiracy, the Court finds that defendants agreed among themselves, while most were still employed by BPS, to do a lawful act—to compete and solicit employees—in an unlawful way, and that defendants' actions have caused significant damages to the plaintiff.

## U.D.T.P.A. Damages and Attorney Fees

{295} The Court concludes that BPS was damaged by conduct that the Court has found to violate the U.D.T.P.A. statute. Such conduct includes unfair actions of defendants in using the BPS/Sunbelt branch managers and other BPS/Sunbelt employees to recruit others to leave BPS/Sunbelt in a coordinated departure to staff new offices of Hi-Lift.

{296} The amount of damages plaintiff has proven was proximately caused by defendants' unlawful actions. *See, e.g., Process Components, Inc. v. Baltimore Aircoil Co*., 89 N.C. App. 649, 652, 366 S.E.2d 907, 910 (1988) (finding that where plaintiff proves damage, amount of damages is for jury to decide).

{297} Sunbelt must show that the amount of damages it seeks is based upon a standard that will allow the Court to calculate the amount of damages with reasonable certainty, although it is not required to prove them to a mathematical certainty. *McNamara v. Wilmington Mall Realty Corp*, 121 N.C. App. 400, 407, 466 S.E.2d 324, 329 (1996) (citing *Olivetti Corp. v. Ames Business Sys*., *Inc.*, 319 N.C. 534, 547, 356 S.E.2d 578, 586 (1987)); s*ee also Byrd's*, 142 N.C. App. at 377, 542 S.E.2d at 693 (finding that law requires that the evidence establish a basis for the assessment of damages with a fair degree of probability, but lost profits are to be evaluated on a case-by-case basis).

{298} Plaintiff is entitled to receive damages that are the natural and probable result of the defendant's illegal actions, but they need not be exact. *See Roane-Barker v. Southeastern Hospital Supply Corp.*, 99 N.C. App. 30, 40, 392 S.E.2d 663, 669 (1990). Indeed, the United States Supreme Court has said that:

> Where the [wrongful conduct] itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of

fundamental principles of justice to deny al. relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result by only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Patterson Parchment Co.*, 282 U.S. 555 (1931).

{299}   This is a unique fact situation unlikely to be replicated. It is factually distinguishable from *Dalton v. Camp* and other similar cases. *See, e.g., Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 555 S.E.2d 634 (2001); *Dalton,* 353 N.C. 647, 548 S.E.2d 704; *Fletcher, Barnhardt & White, Inc. v. Matthews*, 100 N.C. App. 436, 397 S.E.2d 81. Defendants' behavior was closer to that of the employees in *Long v. Vertical Technologies, Inc.,* 115 N.C. App. 598, 439 S.E.2 797, than it was to the employee's behavior in *Dalton.*

{300}    I n *Long*, an employer fired two employees after discovering those employees had founded two companies while employed. The employees did not fully disclose their use of the employer's property to further the business of their new companies. Plaintiff employees sued the employer for, *inter alia,* wrongful discharge. After a bench trial, the trial court found for the employer as to the wrongful discharge claim and the employer's counterclaim for breach of loyalty and fiduciary duty. When our Court of Appeals affirmed the trial court's judgment, it stated:

> Manifestly, when a servant becomes engaged in a business which necessarily renders him a competitor and rival of his master, no matter how much or how little time and attention he devotes to it, he has an interest against his duty. It would be monstrous to hold that the master is bound to retain the servant in his employment after he has thus voluntarily put himself in an attitude hostile to his master's interests. (Citations omitted.)

*Long,* 115 N.C. App. at 604, 439 S.E.2d at 802 (quoting *In re Burris*, 263 N.C. 793, 795, 140 S.E.2d 408, 410 (1965)).

{301}   In the case before this Court, defendants deliberately used key inside managers to orchestrate a plan of conversion of employees that would have the known and desired impact of disrupting BPS/Sunbelt's operations in a way that would provide a competitive advantage for Hi-Lift as it jump-started its new branches. The evidence in this record shows that, pursuant to their unlawful plan, defendants used BPS's time, resources, and trade secrets while they were still employees of the plaintiff.

{302}    One of the keys to profitability in the AWP business is reaching a critical mass of business that can support the overhead and maximize fleet usage. Hepler and Kline were well aware of the need to get to that critical mass quickly because BPS had commissioned a specific study which showed the critical usage and revenue points at its branches. They referenced that target point in their business projections. Slowly building business through the usual methods associated with greenfield operations would have meant a significant delay in reaching the revenue and usage targets necessary for profitability. The secret wholesale raid on the BPS/Sunbelt employee base using the branch managers was designed to and did minimize the time required to reach the critical mass and was a key component in defendants' plan. As a result, profitability was achieved at a rate far swifter than the industry norm. The rapid achievement of high levels of revenue also facilitated borrowing and negotiating with equipment suppliers. Those factors provided the motivation to secretly use the branch managers and others to carry out the plan to convert the employee base and customer business quickly and by surprise.

{303}  The focus on hitting the key BPS branches before a new owner could take control and make efforts to retain the employees and customers explains the need to use the branch managers to pre-position the departures.  Nowhere was that more evident than the last minute actions relating to the Charlotte branch which occurred just before the Sunbelt closing.  It is a fair inference that Charlotte was left until last because Mr. Hepler had the most confidence in the commitment of his brother-in-law to make the changeover.

{304}  Plaintiff's damages are based in part on the incremental profits it lost as a result of defendants' unethical and unlawful conduct and in part on the expenses resulting from the mass departures orchestrated by defendants. It is also based in part on the benefit Hi-Lift received.

{305}  BPS/Sunbelt was damaged by the conduct the Court has found to violate the unfair trade practices statute. That conduct took place in commerce.  BPS/Sunbelt lost employees it may not have otherwise lost.  As a result, BPS/Sunbelt incurred expense in hiring and training new employees.  It lost efficiency in its operation and lost business as a result of the disruption to its business and the advantage created for Hi-Lift by having the old BPS salesmen out soliciting business when BPS/Sunbelt had its sales force suddenly depleted.  BPS/Sunbelt thus experienced a loss of efficient use of its fleet for a period of time until it could get trained sales people and trained mechanics and drivers who could service its accounts.  BPS/Sunbelt lost business, incurred expenses and thus lost profits as a result of defendants' unfair conduct.  The majority of the damage occurred at the Atlanta, Charlotte, Orlando and Fort Myers-Tampa branches.  The impact of the unfair competition was minimal at the Texas branches but existed to some extent.

{306}  If the actions of the branch managers were not taken with the intent of disrupting Sunbelt's business, they were taken with the knowledge and callous disregard of the harm they would cause.  The Court finds the actions were intended to disrupt Sunbelt's business.

{307}  Conversely, Hi-Lift derived a substantial benefit from its unfair conduct.  It's acquisition of a trained work force eliminated training costs and a learning curve for new employees and produced a safer operation.  It obtained market information in the presence of the sales force, customer contacts and relationships, information on customer credit history, current pricing information, current fleet mix information, and an instant "team" useful to the efficient operation of an AWP rental business.

{308}  Because of defendants' unlawful actions, Hi-Lift was able to start greenfield operations at a significantly faster pace and to appropriate the short-term business customers of BPS/Sunbelt because of the disability created by the coordinated mass departures.  Hi-Lift created a profit of approximately $3.4 million in its first year, a unique and remarkable result attributable in large part to the wholesale appropriation of key BPS/Sunbelt employees and the knowledge base they brought with them.

{309}  The damages which were proximately caused by those actions included loss of trained employees, the cost of replacing those employees, loss of customers and business due to inefficient service resulting from the loss of staff, loss of efficient use of its fleet in the affected branches, and general business disruption.

{310}  BPS/Sunbelt was a sufficiently large organization that it could and did replace the lost employees, and its new employees were trained and had the equipment and tools to compete with Hi-Lift in the long run.  Hi-Lift was entitled to compete fairly with BPS/Sunbelt.  The success that the management team had at BPS was a clear indication of their capability, and they had sufficient capital backing.  In the long term, it was clear that Hepler and Kline would provide stiff competition.  BPS could have protected itself against that competition but did not.  Accordingly, the Court finds that the compensable damages are limited to the short-term period of time and expenses it took BPS /Sunbelt to compensate for the actions which the Court has found to be unfair.  For most of the positions, six months was an adequate period of time to hire and train

new employees and have them on the job with competitive capabilities. Many could be hired and trained quicker. At that point the companies were on a fair competitive basis and it would not be unexpected that Hi-Lift would take some market share from BPS/Sunbelt. Therefore the Court has not attributed all lost customers to unfair competition.

{311} There has been significant evidence that many of defendants' rentals made in its "new" markets were made to the same customers and in the same geographic areas as plaintiff's rentals would have been. *See Roane-Barker*, 99 N.C. App. at 40, 392 S.E.2d at 670. Since it could compete lawfully, at least some of those sales would have been made in any event. Accordingly, the Court has not accepted in full the damage calculation proffered by plaintiff's expert.

{312} The clear prospect that Hi-Lift would have taken some market share from BPS in their overlapping markets combined with the overlap of unfair competition and trade secret misappropriation makes the damage assessment more complicated. As a matter of public policy, the Legislature has endorsed that concept that damages can be determined by actual loss to the plaintiff or unjust enrichment of the defendant in the case of misappropriation of trade secrets. *See* N.C.G.S. § 66-154. That policy is equally applicable where the unfair trade practice and misappropriation claims: (1) intermingle, (2) support both claims, and (3) cause damage. For that reason, the Court has considered the profit derived by Hi-Lift from its unusually rapid expansion and achievement of profitability in the first year in determining damages.

{313} The plaintiff has been damaged in the amount of five million dollars by the unfair trade practices of defendants. This is the amount to be trebled in this case; it is the amount the Court concludes represents the actual damages in this case directly flowing from the Chapter 75 violations, including the use of confidential business information. The damages are based upon the number of employees unfairly appropriated by Hi-Lift, their value and the disruption and expense their coordinated departures inflicted on BPS/Sunbelt, as well as the benefit received by Hi-Lift. The damages result from actions in the Atlanta, Charlotte, Orlando and Tampa-Fort Myers markets for the most part, with some smaller allocation for the Texas markets. The extent of the appropriation is set out above in the Findings of Fact. The damages resulted from the coordinated efforts of all the defendants which were part of an overall strategy designed to hit BPS/Sunbelt during the transition period before a transaction could be closed between Rentokil and Sunbelt and to convert customers quickly to take advantage of profitable fleet utilization.

{314} Plaintiff is also entitled to its attorney fees pursuant to N.C.G.S. § 75-16.1 and § 66-152, and to treble damages pursuant to N.C.G.S. § 75-16 to -16.1 ("the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party . . . upon a finding . . . that: (1) The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit. . . ."); § 66-152 ("if willful and malicious misappropriation exists, the court may award reasonable attorney fees to the prevailing party"); § 75-16 ("If any person shall be injured or the business of any . . . corporation shall be broken up . . . or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, . . . if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.").

### Trade Secrets and Damages

{315} The Court has also not dealt separately with the damages for theft of trade secrets. There are several reasons for that omission. First, while there is some direct evidence of the purloining of documents or other written confidential information, the reality is that Hi-Lift hired the people from BPS/Sunbelt who had the expertise to run an AWP business effectively and they hired the salesmen who knew the customers and the market. Pricing information was of fleeting long-term value as the market was intensely competitive. Short-

term pricing or special account pricing was of more value. Most of the information about fleet usage was in the heads of the key management people hired away. They knew the essential needs to get up and running, and, if they did not, the salesmen who were hired knew the customer requirements. Undoubtedly there were instances in which Hi-Lift salesmen simply charged what they knew the customer was paying BPS/Sunbelt, but the customer was free to provide them with that information in any event.

{316} The damages resulting from the use of trade secrets also were subsumed in the damages the Court has found to flow from the unfair competition. It was the orchestrated and deceptive solicitation of the employees who possessed the key information and value that caused the damages. The information on utilization rates by market, average rental rates by market, and customer information, including credit worthiness, constituted information which one or more of the individuals hired by Hi-Lift carried in their heads and were a part of their work experience. The total usurpation of that knowledge base by unfairly using insiders created the specific liability and damage. The use of the branch managers and department heads to recruit other "A Team" players could only have been accomplished by the use of confidential information about their skills and pay levels. Each employee unfairly solicited by defendants brought with him or her a piece of the BPS information bank needed to convert the customer base to Hi-Lift, at least on a short-term basis. It is clear that defendants did not "independently develop" the information used when each branch was started. There is no evidence that market surveys, pricing trend analyses, trade information, employee interviews, advertisements for employees or upcoming construction work information was gathered by anyone at H&E in any of the new markets. Rather, all that information was readily available because of the orchestrated changeover of BPS employees to Hi-Lift.

### Laches

{317} The Court must also examine the defendants' defense of laches, as presented in this case.

{318} The Court finds plaintiff's claims are not barred by laches.

{319} The doctrine of laches requires a showing that: (1) the petitioner negligently failed to assert an enforceable right within a reasonable period of time, and (2) the propounder of the doctrine was prejudiced by the delay in bringing the action. *Costin v. Shell*, 53 N.C. App. 117, 120, 280 S.E.2d 42, 44 (1981) (citing *Builders Supplies v. Gainey*, 282 N.C. 261, 192 S.E.2d 449 (1972); *Rape v. Lyerly*, 287 N.C. 601, 215 S.E.2d 737 (1975)).

{320} Laches is an equitable defense and is not available in actions at law; therefore plaintiff's legal claims should not be barred by laches. *Coppersmith v. Upton*, 228 N.C. 545, 548, 46 S.E.2d 565, 566 (1948) (quoting *U.S. v. Mack*, 295 U.S. 480 (1935)) ("The doctrine of laches . . . is ordinarily regarded as an equitable defense, and it has been held that the plea is not tenable in a court of law and on a legal demand, 'the court being governed by the statute of limitations.'")

{321} Laches is an affirmative defense and the burden of proof is on the party who pleads it. *Taylor v. Raleigh*, 290 N.C. 608, 622, 227 S.E.2d 576, 584 (1976).

{322} The facts and evidence show that the effects of defendants' plan did not emerge until months after Hepler and Kline's departure.

{323} Plaintiff did not delay in initiating its lawsuit; it did so as soon as defendants' plans were clear and when Sunbelt took over at a closing of the purchase transaction. Defendants, fully aware of BPS's transitional

period between execution of the contract and closing, took full advantage of it.

{324} Defendants cannot show that they were prejudiced by plaintiff's alleged delay in the initiation of the lawsuit.

{325} The statute of limitations applicable to a misappropriation of trade secrets claim is three years. N.C.G.S. § 66-157. Plaintiff commenced this action well before the expiration of this period. *See, e.g., Creech v. Creech*, 222 N.C. 656, 663, 24 S.E.2d 642, 647 (1943).

### Counterclaims

{326} In its counterclaim, Defendant H&E has alleged among other things that Sunbelt "resented H&E's lawful success," "wanted to avoid having to compete with H&E for employees and customers," that "[Sunbelt's complaint] allegations are patently false," and that therefore this action is a "sham, filed solely for purposes of interfering with H&E's relationships with its employees, customers and vendors."

{327} H&E further alleges that Sunbelt, by filing a lawsuit, "unlawfully sought to intimidate, harass and scare smaller H&E into wasting its resources and ceasing to lawfully recruit and hire Sunbelt's employees, pursue customers and otherwise compete with Sunbelt."

{328} Defendant H&E's allegations in its counterclaims are not supported by the evidence. The findings of fact recited above are more than sufficient to justify the filing of a lawsuit. Moreover, Defendant H&E has not produced evidence that it was prevented from pursuing, recruiting and hiring Sunbelt's employees, pursuing customers and otherwise competing with Sunbelt. To the contrary, the significant evidence is that Defendant H&E in fact continued and continues to hire Sunbelt employees, has enjoyed remarkable success with customers and has been extraordinarily profitable in short order.

{329} The Court must also determine the fate of Defendant H&E's counterclaim against plaintiff, which alleges that the filing of this lawsuit by Sunbelt is a "sham," and was done solely for the purpose of interfering with H&E's relationships with its employees, customers and vendors in violation of N.C.G.S. § 75-1.1.

{330} Initially, the Court notes that Sunbelt's claims are immunized by the *Noerr-Pennington* doctrine, which is derived from the First Amendment right to petition the government and immunizes legislative, executive and judicial activity from antitrust liability, even if the activity is designed to eliminate competition. *See, e.g., United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) (holding that exercising the right to seek redress from the courts is immune from claims under state and federal anti-competitive statutes alleging injury resulting from the mere prosecution of the lawsuit).

{331} Sunbelt has a constitutional right to seek judicial redress of its injuries. Sunbelt's allegations in the Complaint were well grounded in law and fact, and the evidence presented at trial has shown that defendants orchestrated mass resignations of managers and employees of BPS and diverted business to H&E's new offices using confidential and proprietary information of BPS. Sunbelt has stated valid claims and, as a matter of law, cannot be held liable under Chapter 75 for any incidental effects the lawsuit may have had on H&E Hi-Lift's business. *See, e.g., Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 2001 WL 293661 (M.D.N.C., Feb. 9, 2001); *Merck & Co., Inc. v. Lyon*, 941 F.Supp. 1443, 1447 (M.D.N.C. 1996); *Byrd's,* 142 N.C. App. 371, 542 S.E.2d 689.

{332} Therefore, in light of the findings of fact as set forth above, the Court concludes that Sunbelt brought this

suit with the realistic expectation that its claims would succeed against the defendants, that the suit was "reasonably calculated to elicit a favorable outcome," and that therefore the suit is immunized under the *Noerr-Pennington* Doctrine. *See Baltimore Scrap Corp. v. The David Joseph Co.*, 237 F.3d 394 (4th Cir.2001) ("If an objective party can conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.").

{333} Nevertheless, the *Noerr-Pennington* Doctrine does contain a "sham" exception, and, in order to determine whether Defendant H&E can succeed on its counterclaim, the Court must determine if it has met the two prongs of that exception: (1) whether H&E has shown that no reasonable litigant could realistically expect success on the merits of the claims involved here; and (2) whether H&E has shown that Sunbelt subjectively lacked a reasonable belief that it could succeed on the merits and brought this case for an improper or malicious purpose. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PRE*").

{334} Defendants have presented no facts or evidence to show that Sunbelt subjectively believed the lawsuit was anything but a valid and legal claim for damages caused by the defendants. Certainly there has been no evidence that this lawsuit was brought for any improper purpose. *See also, United States v. Ward*, 618 F. Supp. 884 (E.D.N.C. 1985) ("A party to a lawsuit has a right to use the procedures of the courts to advocate its position, even if such activities cause direct injuries to competitors . . . . Only actions undertaken without a genuine intent to influence the outcome of the dispute being adjudicated are a sham.")

{335} Furthermore, defendants have not presented evidence showing that the lawsuit is objectively baseless, or a "sham." Sunbelt's evidence of H&E's wrongful actions has been detailed and specific. As set forth above in the Court's findings of fact, Sunbelt has shown sufficient evidence for the Court to find defendants liable to Sunbelt for damages on its claims. Therefore, it follows that Defendant H&E has shown no evidence that Sunbelt's allegations are objectively baseless. *PRE*, 508 U.S. at 60. As such, H&E's counterclaim must be dismissed.

{336} For the reasons set forth above, Defendant H&E's counterclaim fails and is therefore dismissed.

### III.

### CONCLUSION

{337} The Court concludes that the application of treble damages is appropriate in this case. It is necessary to prevent defendants and others from profiting from unfair practices. Defendants' actions were deliberate and taken to gain business advantage. Rather than compete in a fair manner, defendants orchestrated the clandestine raid of BPS by the branch managers while the sale to Sunbelt was still pending. The massive nature of the raid facilitated the achievement of the critical mass necessary for profitability. Defendants have benefited from their actions, establishing a viable and profitable business overnight. While they would likely have been successful in the long run, their unfair practices accelerated and enhanced their success. The imposition of treble damages where unfair actions are taken to maximize profits serves the specific purpose for which the treble damage provisions were enacted. The fact that defendants tried to hide their actions by providing less than truthful testimony has also contributed to the Court's decision.

{338} Final judgment will not be entered in this matter until any motion for attorney fees has been heard. Plaintiff will have thirty days from today's date to file a motion for attorney fees with supporting

documentation, and defendants will have thirty days after service to respond.  The Court will then enter a judgment.

{339}   SO ORDERED this 2nd day of May 2003.


Ben F. Tennille
Special Superior Court Judge
for Complex Business Cases

---

Bruckman, Rosser and Sherrill ("BRS") is an equity investment partnership.
[2] The sale of Plant Services is discussed more fully elsewhere in this opinion.